Justice KAVANAUGH delivered the opinion of the Court.
In Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), this Court ruled that a State may not discriminate on the basis of race when exercising peremptory challenges against prospective jurors in a criminal trial.
In 1996, Curtis Flowers allegedly murdered four people in Winona, Mississippi. Flowers is black. He has been tried six separate times before a jury for murder. The same lead prosecutor represented the State in all six trials.
*2235 In the initial three trials, Flowers was convicted, but the Mississippi Supreme Court reversed each conviction. In the first trial, Flowers was convicted, but the Mississippi Supreme Court reversed the conviction due to "numerous instances of prosecutorial misconduct." Flowers v. State , 773 So.2d 309, 327 (2000). In the second trial, the trial court found that the prosecutor discriminated on the basis of race in the peremptory challenge of a black juror. The trial court seated the black juror. Flowers was then convicted, but the Mississippi Supreme Court again reversed the conviction because of prosecutorial misconduct at trial. In the third trial, Flowers was convicted, but the Mississippi Supreme Court yet again reversed the conviction, this time because the court concluded that the prosecutor had again discriminated against black prospective jurors in the jury selection process. The court's lead opinion stated: "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a Batson challenge." Flowers v. State , 947 So.2d 910, 935 (2007). The opinion further stated that the "State engaged in racially discriminatory practices during the jury selection process" and that the "case evinces an effort by the State to exclude African-Americans from jury service." Id., at 937, 939.
The fourth and fifth trials of Flowers ended in mistrials due to hung juries.
In his sixth trial, which is the one at issue here, Flowers was convicted. The State struck five of the six black prospective jurors. On appeal, Flowers argued that the State again violated Batson in exercising peremptory strikes against black prospective jurors. In a divided 5-to-4 decision, the Mississippi Supreme Court affirmed the conviction. We granted certiorari on the Batson question and now reverse. See 586 U. S. ----, 139 S.Ct. 451, 202 L.Ed.2d 346 (2018).
Four critical facts, taken together, require reversal. First , in the six trials combined, the State employed its peremptory challenges to strike 41 of the 42 black prospective jurors that it could have struck-a statistic that the State acknowledged at oral argument in this Court. Tr. of Oral Arg. 32. Second , in the most recent trial, the sixth trial, the State exercised peremptory strikes against five of the six black prospective jurors. Third , at the sixth trial, in an apparent effort to find pretextual reasons to strike black prospective jurors, the State engaged in dramatically disparate questioning of black and white prospective jurors. Fourth , the State then struck at least one black prospective juror, Carolyn Wright, who was similarly situated to white prospective jurors who were not struck by the State.
We need not and do not decide that any one of those four facts alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not "motivated in substantial part by discriminatory intent." Foster v. Chatman , 578 U. S. ----, ----, 136 S.Ct. 1737, 1754, 195 L.Ed.2d 1 (2016) (internal quotation marks omitted). In reaching that conclusion, we break no new legal ground. We simply enforce and reinforce Batson by applying it to the extraordinary facts of this case.
We reverse the judgment of the Supreme Court of Mississippi, and we remand the case for further proceedings not inconsistent with this opinion.
I
The underlying events that gave rise to this case took place in Winona, Mississippi.
*2236 Winona is a small town in northern Mississippi, just off I-55 almost halfway between Jackson and Memphis. The total population of Winona is about 5,000. The town is about 53 percent black and about 46 percent white.
In 1996, Bertha Tardy, Robert Golden, Derrick Stewart, and Carmen Rigby were murdered at the Tardy Furniture store in Winona. All four victims worked at the Tardy Furniture store. Three of the four victims were white; one was black. In 1997, the State charged Curtis Flowers with murder. Flowers is black. Since then, Flowers has been tried six separate times for the murders. In each of the first two trials, Flowers was tried for one individual murder. In each subsequent trial, Flowers was tried for all four of the murders together. The same state prosecutor tried Flowers each time. The prosecutor is white.
At Flowers' first trial, 36 prospective jurors-5 black and 31 white-were presented to potentially serve on the jury. The State exercised a total of 12 peremptory strikes, and it used 5 of them to strike the five qualified black prospective jurors. Flowers objected, arguing under Batson that the State had exercised its peremptory strikes in a racially discriminatory manner. The trial court rejected the Batson challenge. Because the trial court allowed the State's peremptory strikes, Flowers was tried in front of an all-white jury. The jury convicted Flowers and sentenced him to death.
On appeal, the Mississippi Supreme Court reversed the conviction, concluding that the State had committed prosecutorial misconduct in front of the jury by, among other things, expressing baseless grounds for doubting the credibility of witnesses and mentioning facts that had not been allowed into evidence by the trial judge. Flowers , 773 So.2d at 317, 334. In its opinion, the Mississippi Supreme Court described "numerous instances of prosecutorial misconduct" at the trial. Id., at 327. Because the Mississippi Supreme Court reversed based on prosecutorial misconduct at trial, the court did not reach Flowers' Batson argument. See Flowers , 773 So.2d at 327.
At the second trial, 30 prospective jurors-5 black and 25 white-were presented to potentially serve on the jury. As in Flowers' first trial, the State again used its strikes against all five black prospective jurors. But this time, the trial court determined that the State's asserted reason for one of the strikes was a pretext for discrimination. Specifically, the trial court determined that one of the State's proffered reasons-that the juror had been inattentive and was nodding off during jury selection-for striking that juror was false, and the trial court therefore sustained Flowers' Batson challenge. The trial court disallowed the strike and sat that black juror on the jury. The jury at Flowers' second trial consisted of 11 white jurors and 1 black juror. The jury convicted Flowers and sentenced him to death.
On appeal, the Mississippi Supreme Court again reversed. The court ruled that the prosecutor had again engaged in prosecutorial misconduct in front of the jury by, among other things, impermissibly referencing evidence and attempting to undermine witness credibility without a factual basis. See Flowers v. State , 842 So.2d 531, 538, 553 (2003).
At Flowers' third trial, 45 prospective jurors-17 black and 28 white-were presented to potentially serve on the jury. One of the black prospective jurors was struck for cause, leaving 16. The State exercised a total of 15 peremptory strikes, and it used all 15 against black prospective jurors. Flowers again argued that the State had used its peremptory strikes in a *2237 racially discriminatory manner. The trial court found that the State had not discriminated on the basis of race. See Flowers , 947 So.2d at 916. The jury in Flowers' third trial consisted of 11 white jurors and 1 black juror. The lone black juror who served on the jury was seated after the State ran out of peremptory strikes. The jury convicted Flowers and sentenced him to death.
On appeal, the Mississippi Supreme Court yet again reversed, concluding that the State had again violated Batson by discriminating on the basis of race in exercising all 15 of its peremptory strikes against 15 black prospective jurors. See Flowers , 947 So.2d at 939. The court's lead opinion stated: "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a Batson challenge." Id., at 935. The opinion explained that although "each individual strike may have justifiably appeared to the trial court to be sufficiently race neutral, the trial court also has a duty to look at the State's use of peremptory challenges in toto ." Id., at 937. The opinion emphasized that "trial judges should not blindly accept any and every reason put forth by the State, especially" when "the State continues to exercise challenge after challenge only upon members of a particular race." Ibid . The opinion added that the "State engaged in racially discriminatory practices" and that the "case evinces an effort by the State to exclude African-Americans from jury service." Id., at 937, 939.
At Flowers' fourth trial, 36 prospective jurors-16 black and 20 white-were presented to potentially serve on the jury. The State exercised a total of 11 peremptory strikes, and it used all 11 against black prospective jurors. But because of the relatively large number of prospective jurors who were black, the State did not have enough peremptory challenges to eliminate all of the black prospective jurors. The seated jury consisted of seven white jurors and five black jurors. That jury could not reach a verdict, and the proceeding ended in a mistrial.
As to the fifth trial, there is no available racial information about the prospective jurors, as distinct from the jurors who ultimately sat on the jury. The jury was composed of nine white jurors and three black jurors. The jury could not reach a verdict, and the trial again ended in a mistrial.
At the sixth trial, which we consider here, 26 prospective jurors-6 black and 20 white-were presented to potentially serve on the jury. The State exercised a total of six peremptory strikes, and it used five of the six against black prospective jurors, leaving one black juror to sit on the jury. Flowers again argued that the State had exercised its peremptory strikes in a racially discriminatory manner. The trial court concluded that the State had offered race-neutral reasons for each of the five peremptory strikes against the five black prospective jurors. The jury at Flowers' sixth trial consisted of 11 white jurors and 1 black juror. That jury convicted Flowers of murder and sentenced him to death.
In a divided decision, the Mississippi Supreme Court agreed with the trial court on the Batson issue and stated that the State's "race-neutral reasons were valid and not merely pretextual." Flowers v. State , 158 So.3d 1009, 1058 (2014). Flowers then sought review in this Court. This Court granted Flowers' petition for a writ of certiorari, vacated the judgment of the Mississippi Supreme Court, and remanded for further consideration in light of the decision in Foster , 578 U. S. ----, 136 S.Ct. 1737, 195 L.Ed.2d 1. Flowers v. Mississippi , 579 U. S. ----, 136 S.Ct. 2157, 195 L.Ed.2d 817 (2016). In Foster , this *2238 Court held that the defendant Foster had established a Batson violation. 578 U. S., at ----, 136 S.Ct., at 1755.
On remand, the Mississippi Supreme Court by a 5-to-4 vote again upheld Flowers' conviction. See 240 So.3d 1082 (2017). Justice King wrote a dissent for three justices. He stated: "I cannot conclude that Flowers received a fair trial, nor can I conclude that prospective jurors were not subjected to impermissible discrimination." Id ., at 1172. According to Justice King, both the trial court and the Mississippi Supreme Court "completely disregard[ed] the constitutional right of prospective jurors to be free from a racially discriminatory selection process." Id., at 1171. We granted certiorari. See 586 U. S. ----, 139 S.Ct. 451, 202 L.Ed.2d 346.
II
A
Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process. See Powers v. Ohio , 499 U.S. 400, 407, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).
Jury selection in criminal cases varies significantly based on state and local rules and practices, but ordinarily consists of three phases, which we describe here in general terms. First , a group of citizens in the community is randomly summoned to the courthouse on a particular day for potential jury service. Second , a subgroup of those prospective jurors is called into a particular courtroom for a specific case. The prospective jurors are often questioned by the judge, as well as by the prosecutor and defense attorney. During that second phase, the judge may excuse certain prospective jurors based on their answers. Third , the prosecutor and defense attorney may challenge certain prospective jurors. The attorneys may challenge prospective jurors for cause, which usually stems from a potential juror's conflicts of interest or inability to be impartial. In addition to challenges for cause, each side is typically afforded a set number of peremptory challenges or strikes. Peremptory strikes have very old credentials and can be traced back to the common law. Those peremptory strikes traditionally may be used to remove any potential juror for any reason-no questions asked.
That blanket discretion to peremptorily strike prospective jurors for any reason can clash with the dictates of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. This case arises at the intersection of the peremptory challenge and the Equal Protection Clause. And to understand how equal protection law applies to peremptory challenges, it helps to begin at the beginning.
Ratified in 1868 in the wake of the Civil War, the Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." A primary objective of the Equal Protection Clause, this Court stated just five years after ratification, was "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." Slaughter-House Cases , 16 Wall. 36, 71, 21 L.Ed. 394 (1873).
In 1875, to help enforce the Fourteenth Amendment, Congress passed and President Ulysses S. Grant signed the Civil Rights Act of 1875. Ch. 114, 18 Stat. 335. Among other things, that law made it a criminal offense for state officials to exclude individuals from jury service on account *2239 of their race. 18 U. S. C. § 243. The Act provides: "No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude."
In 1880, just 12 years after ratification of the Fourteenth Amendment, the Court decided Strauder v. West Virginia , 100 U.S. 303, 25 L.Ed. 664. That case concerned a West Virginia statute that allowed whites only to serve as jurors. The Court held the law unconstitutional.
In reaching its conclusion, the Court explained that the Fourteenth Amendment required "that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color." Id., at 307. In the words of the Strauder Court: "The very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." Id ., at 308. For those reasons, the Court ruled that the West Virginia statute excluding blacks from jury service violated the Fourteenth Amendment.
As the Court later explained in Brown v. Board of Education , 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Court's decisions in the Slaughter-House Cases and Strauder interpreted the Fourteenth Amendment "as proscribing all state-imposed discriminations against the Negro race," including in jury service. Brown , 347 U.S. at 490, 74 S.Ct. 686.
In the decades after Strauder , the Court reiterated that States may not discriminate on the basis of race in jury selection. See, e.g., Neal v. Delaware , 103 U.S. 370, 397, 26 L.Ed. 567 (1881) ; Carter v. Texas , 177 U.S. 442, 447, 20 S.Ct. 687, 44 L.Ed. 839 (1900) ; Norris v. Alabama , 294 U.S. 587, 597-599, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) ; Hale v. Kentucky , 303 U.S. 613, 616, 58 S.Ct. 753, 82 L.Ed. 1050 (1938) (per curiam ); Pierre v. Louisiana , 306 U.S. 354, 362, 59 S.Ct. 536, 83 L.Ed. 757 (1939) ; Smith v. Texas , 311 U.S. 128, 130-131, 61 S.Ct. 164, 85 L.Ed. 84 (1940) ; Avery v. Georgia , 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) ; Hernandez v. Texas , 347 U.S. 475, 477-478, 482, 74 S.Ct. 667, 98 L.Ed. 866 (1954) ; Coleman v. Alabama , 377 U.S. 129, 133, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964).
But critical problems persisted. Even though laws barring blacks from serving on juries were unconstitutional after Strauder , many jurisdictions employed various discriminatory tools to prevent black persons from being called for jury service. And when those tactics failed, or were invalidated, prosecutors could still exercise peremptory strikes in individual cases to remove most or all black prospective jurors.
In the century after Strauder , the freedom to exercise peremptory strikes for any reason meant that "the problem of racial exclusion from jury service" remained "widespread" and "deeply entrenched." 5 U. S. Commission on Civil Rights Report 90 (1961). Simple math shows how that happened. Given that blacks were a minority of the population, *2240 in many jurisdictions the number of peremptory strikes available to the prosecutor exceeded the number of black prospective jurors. So prosecutors could routinely exercise peremptories to strike all the black prospective jurors and thereby ensure all-white juries. The exclusion of black prospective jurors was almost total in certain jurisdictions, especially in cases involving black defendants. Similarly, defense counsel could use-and routinely did use-peremptory challenges to strike all the black prospective jurors in cases involving white defendants and black victims.
In the aftermath of Strauder , the exclusion of black jurors became more covert and less overt-often accomplished through peremptory challenges in individual courtrooms rather than by blanket operation of law. But as this Court later noted, the results were the same for black jurors and black defendants, as well as for the black community's confidence in the fairness of the American criminal justice system. See Batson , 476 U.S. at 98-99, 106 S.Ct. 1712.
Eighty-five years after Strauder , the Court decided Swain v. Alabama , 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The defendant Swain was black. Swain was convicted of a capital offense in Talladega County, Alabama, and sentenced to death. Swain presented evidence that no black juror had served on a jury in Talladega County in more than a decade. See id ., at 226, 85 S.Ct. 824. And in Swain's case, the prosecutor struck all six qualified black prospective jurors, ensuring that Swain was tried before an all-white jury. Swain invoked Strauder to argue that the prosecutor in his case had impermissibly discriminated on the basis of race by using peremptory challenges to strike the six black prospective jurors. See 380 U.S. at 203, 210, 85 S.Ct. 824.
This Court ruled that Swain had not established unconstitutional discrimination. Most importantly, the Court held that a defendant could not object to the State's use of peremptory strikes in an individual case. In the Court's words: "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws." Id., at 221, 85 S.Ct. 824. The Swain Court reasoned that prosecutors do not always judge prospective jurors individually when exercising peremptory strikes. Instead, prosecutors choose which prospective jurors to strike "in light of the limited knowledge counsel has of them, which may include their group affiliations, in the context of the case to be tried." Ibid . In the Court's view, the prosecutor could strike prospective jurors on the basis of their group affiliations, including race. In other words, a prosecutor could permissibly strike a prospective juror for any reason, including the assumption or belief that a black prospective juror, because of race, would be favorable to a black defendant or unfavorable to the State. See id., at 220-221, 85 S.Ct. 824.
To be sure, the Swain Court held that a defendant could make out a case of racial discrimination by showing that the State "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," had been responsible for the removal of qualified black prospective jurors so that no black jurors "ever serve on petit juries." Id., at 223, 85 S.Ct. 824. But Swain 's high bar for establishing a constitutional violation was almost impossible for any defendant to surmount, as the aftermath of Swain amply demonstrated.
Twenty-one years later, in its 1986 decision in Batson , the Court revisited several critical aspects of Swain and in essence overruled them. In so doing, the Batson Court emphasized that "the central concern"
*2241 of the Fourteenth Amendment "was to put an end to governmental discrimination on account of race." 476 U.S. at 85, 106 S.Ct. 1712. The Batson Court noted that Swain had left prosecutors' peremptory challenges "largely immune from constitutional scrutiny." 476 U.S. at 92-93, 106 S.Ct. 1712. In his concurrence in Batson , Justice Byron White (the author of Swain ) agreed that Swain should be overruled. He stated: "[T]he practice of peremptorily eliminating blacks from petit juries in cases with black defendants remains widespread, so much so" that "I agree with the Court that the time has come to rule as it has." 476 U.S. at 101-102, 106 S.Ct. 1712.
Under Batson , once a prima facie case of discrimination has been shown by a defendant, the State must provide race-neutral reasons for its peremptory strikes. The trial judge must determine whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination. Id., at 97-98, 106 S.Ct. 1712.
Four parts of Batson warrant particular emphasis here.
First , the Batson Court rejected Swain 's insistence that a defendant demonstrate a history of racially discriminatory strikes in order to make out a claim of race discrimination. See 476 U.S. at 95, 106 S.Ct. 1712. According to the Batson Court, defendants had run into "practical difficulties" in trying to prove that a State had systematically "exercised peremptory challenges to exclude blacks from the jury on account of race." Id ., at 92, n. 17, 106 S.Ct. 1712. The Batson Court explained that, in some jurisdictions, requiring a defendant to "investigate, over a number of cases, the race of persons tried in the particular jurisdiction, the racial composition of the venire and petit jury, and the manner in which both parties exercised their peremptory challenges" posed an "insurmountable" burden. Ibid .
In addition to that practical point, the Court stressed a basic equal protection point: In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many.
For those reasons, the Batson Court held that a criminal defendant could show "purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial ." Id ., at 96, 106 S.Ct. 1712 (emphasis added).
Second , the Batson Court rejected Swain 's statement that a prosecutor could strike a black juror based on an assumption or belief that the black juror would favor a black defendant. In some of the most critical sentences in the Batson opinion, the Court emphasized that a prosecutor may not rebut a claim of discrimination "by stating merely that he challenged jurors of the defendant's race on the assumption-or his intuitive judgment-that they would be partial to the defendant because of their shared race." 476 U.S. at 97, 106 S.Ct. 1712. The Court elaborated: The Equal Protection Clause "forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black. The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' race." Id., at 97-98, 106 S.Ct. 1712. In his concurrence, Justice Thurgood Marshall drove the point home: "Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than *2242 whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks lack the intelligence, experience, or moral integrity to be entrusted with that role." Id., at 104-105, 106 S.Ct. 1712 (internal quotation marks and citations omitted).
Third , the Batson Court did not accept the argument that race-based peremptories should be permissible because black, white, Asian, and Hispanic defendants and jurors were all "equally" subject to race-based discrimination. The Court stated that each removal of an individual juror because of his or her race is a constitutional violation. Discrimination against one defendant or juror on account of race is not remedied or cured by discrimination against other defendants or jurors on account of race. As the Court later explained: Some say that there is no equal protection violation if individuals "of all races are subject to like treatment, which is to say that white jurors are subject to the same risk of peremptory challenges based on race as are all other jurors. The suggestion that racial classifications may survive when visited upon all persons is no more authoritative today than the case which advanced the theorem, Plessy v. Ferguson , 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). This idea has no place in our modern equal protection jurisprudence. It is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree." Powers , 499 U.S. at 410, 111 S.Ct. 1364 (citing Loving v. Virginia , 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ).
Fourth , the Batson Court did not accept the argument that race-based peremptories are permissible because both the prosecution and defense could employ them in any individual case and in essence balance things out. Under the Equal Protection Clause, the Court stressed, even a single instance of race discrimination against a prospective juror is impermissible. Moreover, in criminal cases involving black defendants, the both-sides-can-do-it argument overlooks the percentage of the United States population that is black (about 12 percent) and the cold reality of jury selection in most jurisdictions. Because blacks are a minority in most jurisdictions, prosecutors often have more peremptory strikes than there are black prospective jurors on a particular panel. In the pre- Batson era, therefore, allowing each side in a case involving a black defendant to strike prospective jurors on the basis of race meant that a prosecutor could eliminate all of the black jurors, but a black defendant could not eliminate all of the white jurors. So in the real world of criminal trials against black defendants, both history and math tell us that a system of race-based peremptories does not treat black defendants and black prospective jurors equally with prosecutors and white prospective jurors. Cf. Batson , 476 U.S. at 99, 106 S.Ct. 1712.
B
Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process. Enforcing that constitutional principle, Batson ended the widespread practice in which prosecutors could (and often would) routinely strike all black prospective jurors in cases involving black defendants. By taking steps to eradicate racial discrimination from the jury selection process, Batson sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system. Batson immediately revolutionized the jury selection process that takes place *2243 every day in federal and state criminal courtrooms throughout the United States.
In the decades since Batson , this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding. See Foster , 578 U. S. ----, 136 S.Ct. 1737, 195 L.Ed.2d 1 ; Snyder v. Louisiana , 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) ; Miller-El v. Dretke , 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ( Miller-El II ). Moreover, the Court has extended Batson in certain ways. A defendant of any race may raise a Batson claim, and a defendant may raise a Batson claim even if the defendant and the excluded juror are of different races. See Hernandez , 347 U.S. at 477-478, 74 S.Ct. 667 ; Powers , 499 U.S. at 406, 111 S.Ct. 1364. Moreover, Batson now applies to gender discrimination, to a criminal defendant's peremptory strikes, and to civil cases. See J. E. B. v. Alabama ex rel. T. B. , 511 U.S. 127, 129, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) ; Georgia v. McCollum , 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) ; Edmonson v. Leesville Concrete Co. , 500 U.S. 614, 616, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991).
Of particular relevance here, Batson 's holding raised several important evidentiary and procedural issues, three of which we underscore.
First , what factors does the trial judge consider in evaluating whether racial discrimination occurred? Our precedents allow criminal defendants raising Batson challenges to present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race. For example, defendants may present:
• statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
• evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
• side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
• a prosecutor's misrepresentations of the record when defending the strikes during the Batson hearing;
• relevant history of the State's peremptory strikes in past cases; or
• other relevant circumstances that bear upon the issue of racial discrimination.
See Foster , 578 U. S. ----, 136 S.Ct. 1737, 195 L.Ed.2d 1 ; Snyder , 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 ; Miller-El II , 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 ; Batson , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.
Second , who enforces Batson ? As the Batson Court itself recognized, the job of enforcing Batson rests first and foremost with trial judges. See id ., at 97, 99, n. 22, 106 S.Ct. 1712. America's trial judges operate at the front lines of American justice. In criminal trials, trial judges possess the primary responsibility to enforce Batson and prevent racial discrimination from seeping into the jury selection process.
As the Batson Court explained and as the Court later reiterated, once a prima facie case of racial discrimination has been established, the prosecutor must provide race-neutral reasons for the strikes. The trial court must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties. The trial judge's assessment *2244 of the prosecutor's credibility is often important. The Court has explained that "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge." Snyder , 552 U.S. at 477, 128 S.Ct. 1203 (quotation altered). "We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province." Ibid . (internal quotation marks omitted). The trial judge must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race. The ultimate inquiry is whether the State was "motivated in substantial part by discriminatory intent." Foster , 578 U. S., at ----, 136 S.Ct., at 1754 (internal quotation marks omitted).
Third , what is the role of appellate review? An appeals court looks at the same factors as the trial judge, but is necessarily doing so on a paper record. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson , 476 U.S. at 98, n. 21, 106 S.Ct. 1712. The Court has described the appellate standard of review of the trial court's factual determinations in a Batson hearing as "highly deferential." Snyder , 552 U.S. at 479, 128 S.Ct. 1203. "On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." Id., at 477, 128 S.Ct. 1203.
III
In accord with the principles set forth in Batson , we now address Flowers' case.
The Constitution forbids striking even a single prospective juror for a discriminatory purpose. See Foster , 578 U. S., at ----, 136 S.Ct., at 1747. The question for this Court is whether the Mississippi trial court clearly erred in concluding that the State was not "motivated in substantial part by discriminatory intent" when exercising peremptory strikes at Flowers' sixth trial. Id ., at ----, 136 S.Ct., at 1754 (internal quotation marks omitted); see also Snyder , 552 U.S. at 477, 128 S.Ct. 1203. Because this case arises on direct review, we owe no deference to the Mississippi Supreme Court, as distinct from deference to the Mississippi trial court.
Four categories of evidence loom large in assessing the Batson issue in Flowers' case: (1) the history from Flowers' six trials, (2) the prosecutor's striking of five of six black prospective jurors at the sixth trial, (3) the prosecutor's dramatically disparate questioning of black and white prospective jurors at the sixth trial, and (4) the prosecutor's proffered reasons for striking one black juror (Carolyn Wright) while allowing other similarly situated white jurors to serve on the jury at the sixth trial. We address each in turn.
A
First, we consider the relevant history of the case. Recall that in Swain , the Court held that a defendant may prove racial discrimination by establishing a historical pattern of racial exclusion of jurors in the jurisdiction in question. Indeed, under Swain , that was the only way that a defendant could make out a claim that the State discriminated on the basis of race in the use of peremptory challenges.
In Batson , the Court ruled that Swain had imposed too heavy a burden on defendants seeking to prove that a prosecutor had used peremptory strikes in a racially discriminatory manner. Batson lowered the evidentiary burden for defendants to contest prosecutors' use of peremptory *2245 strikes and made clear that demonstrating a history of discriminatory strikes in past cases was not necessary.
In doing so, however, Batson did not preclude defendants from still using the same kinds of historical evidence that Swain had allowed defendants to use to support a claim of racial discrimination. Most importantly for present purposes, after Batson, the trial judge may still consider historical evidence of the State's discriminatory peremptory strikes from past trials in the jurisdiction, just as Swain had allowed. After Batson , the defendant may still cast Swain 's "wide net" to gather " 'relevant' " evidence. Miller-El II , 545 U.S. at 239-240, 125 S.Ct. 2317. A defendant may rely on "all relevant circumstances." Batson , 476 U.S. at 96-97, 106 S.Ct. 1712.
Here, our review of the history of the prosecutor's peremptory strikes in Flowers' first four trials strongly supports the conclusion that his use of peremptory strikes in Flowers' sixth trial was motivated in substantial part by discriminatory intent. (Recall that there is no record evidence from the fifth trial regarding the race of the prospective jurors.)
The numbers speak loudly. Over the course of the first four trials, there were 36 black prospective jurors against whom the State could have exercised a peremptory strike. The State tried to strike all 36. The State used its avail-able peremptory strikes to attempt to strike every single black prospective juror that it could have struck. (At oral argument in this Court, the State acknowledged that statistic. Tr. of Oral Arg. 32.) Not only did the State's use of peremptory strikes in Flowers' first four trials reveal a blatant pattern of striking black prospective jurors, the Mississippi courts themselves concluded on two separate occasions that the State violated Batson . In Flowers' second trial, the trial court concluded that the State discriminated against a black juror. Specifically, the trial court determined that one of the State's proffered reasons-that the juror had been inattentive and was nodding off during jury selection-for striking that juror was false, and the trial court therefore sustained Flowers' Batson challenge. In Flowers' next trial-his third trial-the prosecutor used all 15 of its peremptories to strike 15 black prospective jurors. The lead opinion of the Mississippi Supreme Court stated: "The instant case presents us with as strong a prima facie case of racial discrimination as we have ever seen in the context of a Batson challenge." Flowers , 947 So.2d at 935. The opinion further stated that "the State engaged in racially discriminatory practices during the jury selection process" and that the "case evinces an effort by the State to exclude African-Americans from jury service." Id., at 937, 939.
To summarize the most relevant history: In Flowers' first trial, the prosecutor successfully used peremptory strikes against all of the black prospective jurors. Flowers faced an all-white jury. In Flowers' second trial, the prosecutor tried again to strike all of the black prospective jurors, but the trial court decided that the State could not strike one of those jurors. The jury consisted of 11 white jurors and 1 black juror. In Flowers' third trial, there were 17 black prospective jurors. The prosecutor used 15 out of 15 peremptory strikes against black prospective jurors. After one black juror was struck for cause and the prosecutor ran out of strikes, one black juror remained. The jury again consisted of 11 white jurors and 1 black juror. In Flowers' fourth trial, the prosecutor again used 11 out of 11 peremptory strikes against black prospective jurors. Because of the large number of black prospective jurors at the trial, the prosecutor ran out of peremptory *2246 strikes before it could strike all of the black prospective jurors. The jury for that trial consisted of seven white jurors and five black jurors, and the jury was unable to reach a verdict. To reiterate, there is no available information about the race of prospective jurors in the fifth trial. The jury for that trial consisted of nine white jurors and three black jurors, and the jury was unable to reach a verdict.
Stretching across Flowers' first four trials, the State employed its peremptory strikes to remove as many black prospective jurors as possible. The State appeared to proceed as if Batson had never been decided. The State's relentless, determined effort to rid the jury of black individuals strongly suggests that the State wanted to try Flowers before a jury with as few black jurors as possible, and ideally before an all-white jury. The trial judge was aware of the history. But the judge did not sufficiently account for the history when considering Flowers' Batson claim.
The State's actions in the first four trials necessarily inform our assessment of the State's intent going into Flowers' sixth trial. We cannot ignore that history. We cannot take that history out of the case.
B
We turn now to the State's strikes of five of the six black prospective jurors at Flowers' sixth trial, the trial at issue here. As Batson noted, a " 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97, 106 S.Ct. 1712.
Flowers' sixth trial occurred in June 2010. At trial, 26 prospective jurors were presented to potentially serve on the jury. Six of the prospective jurors were black. The State accepted one black prospective juror-Alexander Robinson. The State struck the other five black prospective jurors-Carolyn Wright, Tashia Cunningham, Edith Burnside, Flancie Jones, and Dianne Copper. The resulting jury consisted of 11 white jurors and 1 black juror.
The State's use of peremptory strikes in Flowers' sixth trial followed the same pattern as the first four trials, with one modest exception: It is true that the State accepted one black juror for Flowers' sixth trial. But especially given the history of the case, that fact alone cannot insulate the State from a Batson challenge. In Miller-El II , this Court skeptically viewed the State's decision to accept one black juror, explaining that a prosecutor might do so in an attempt "to obscure the otherwise consistent pattern of opposition to" seating black jurors. 545 U.S. at 250, 125 S.Ct. 2317. The overall record of this case suggests that the same tactic may have been employed here. In light of all of the circumstances here, the State's decision to strike five of the six black prospective jurors is further evidence suggesting that the State was motivated in substantial part by discriminatory intent.
C
We next consider the State's dramatically disparate questioning of black and white prospective jurors in the jury selection process for Flowers' sixth trial. As Batson explained, "the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." 476 U.S. at 97, 106 S.Ct. 1712.
The questioning process occurred through an initial group voir dire and then more in-depth follow-up questioning by the prosecutor and defense counsel of individual prospective jurors. The State asked the five black prospective jurors who were struck a total of 145 questions. By contrast, *2247 the State asked the 11 seated white jurors a total of 12 questions. On average, therefore, the State asked 29 questions to each struck black prospective juror. The State asked an average of one question to each seated white juror.
One can slice and dice the statistics and come up with all sorts of ways to compare the State's questioning of excluded black jurors with the State's questioning of the accepted white jurors. But any meaningful comparison yields the same basic assessment: The State spent far more time questioning the black prospective jurors than the accepted white jurors.
The State acknowledges, as it must under our precedents, that disparate questioning can be probative of discriminatory intent. See Miller-El v. Cockrell , 537 U.S. 322, 331-332, 344-345, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ( Miller-El I ). As Miller-El I stated, "if the use of disparate questioning is determined by race at the outset, it is likely [that] a justification for a strike based on the resulting divergent views would be pretextual. In this context the differences in the questions posed by the prosecutors are some evidence of purposeful discrimination." Id., at 344, 123 S.Ct. 1029.
But the State here argues that it questioned black and white prospective jurors differently only because of differences in the jurors' characteristics. The record refutes that explanation.
For example, Dianne Copper was a black prospective juror who was struck. The State asked her 18 follow-up questions about her relationships with Flowers' family and with witnesses in the case. App. 188-190. Pamela Chesteen was a white juror whom the State accepted for the jury. Although the State asked questions of Chesteen during group voir dire , the State asked her no individual follow-up questions about her relationships with Flowers' family, even though the State was aware that Chesteen knew several members of Flowers' family. Compare id ., at 83, with id ., at 111. Similarly, the State asked no individual follow-up questions to four other white prospective jurors who, like Dianne Copper, had relationships with defense witnesses, even though the State was aware of those relationships. Those white prospective jurors were Larry Blaylock, Harold Waller, Marcus Fielder, and Bobby Lester.
Likewise, the State conducted disparate investigations of certain prospective jurors. Tashia Cunningham, who is black, stated that she worked with Flowers' sister, but that the two did not work closely together. To try to disprove that statement, the State summoned a witness to challenge Cunningham's testimony. Id ., at 148-150. The State apparently did not conduct similar investigations of white prospective jurors.
It is certainly reasonable for the State to ask follow-up questions or to investigate the relationships of jurors to the victims, potential witnesses, and the like. But white prospective jurors who were acquainted with the Flowers' family or defense witnesses were not questioned extensively by the State or investigated. White prospective jurors who admitted that they or a relative had been convicted of a crime were accepted without apparent further inquiry by the State. The difference in the State's approaches to black and white prospective jurors was stark.
Why did the State ask so many more questions-and conduct more vigorous inquiry-of black prospective jurors than it did of white prospective jurors? No one can know for certain. But this Court's cases explain that disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with *2248 seemingly race-neutral reasons to strike the prospective jurors of a particular race. See Miller-El I , 537 U.S. at 331-332, 344-345, 123 S.Ct. 1029. In other words, by asking a lot of questions of the black prospective jurors or conducting additional inquiry into their backgrounds, a prosecutor can try to find some pretextual reason-any reason-that the prosecutor can later articulate to justify what is in reality a racially motivated strike. And by not doing the same for white prospective jurors, by not asking white prospective jurors those same questions, the prosecutor can try to distort the record so as to thereby avoid being accused of treating black and white jurors differently. Disparity in questioning and investigation can produce a record that says little about white prospective jurors and is therefore resistant to characteristic-by-characteristic comparisons of struck black prospective jurors and seated white jurors. Prosecutors can decline to seek what they do not want to find about white prospective jurors.
A court confronting that kind of pattern cannot ignore it. The lopsidedness of the prosecutor's questioning and inquiry can itself be evidence of the prosecutor's objective as much as it is of the actual qualifications of the black and white prospective jurors who are struck or seated. The prosecutor's dramatically disparate questioning of black and white prospective jurors-at least if it rises to a certain level of disparity-can supply a clue that the prosecutor may have been seeking to paper the record and disguise a discriminatory intent. See ibid .
To be clear, disparate questioning or investigation alone does not constitute a Batson violation. The disparate questioning or investigation of black and white prospective jurors may reflect ordinary race-neutral considerations. But the disparate questioning or investigation can also, along with other evidence, inform the trial court's evaluation of whether discrimination occurred.
Here, along with the historical evidence we described above from the earlier trials, as well as the State's striking of five of six black prospective jurors at the sixth trial, the dramatically disparate questioning and investigation of black prospective jurors and white prospective jurors at the sixth trial strongly suggests that the State was motivated in substantial part by a discriminatory intent. We agree with the observation of the dissenting justices of the Mississippi Supreme Court: The "numbers described above are too disparate to be explained away or categorized as mere happenstance." 240 So.3d at 1161 (opinion of King, J.).
D
Finally, in combination with the other facts and circumstances in this case, the record of jury selection at the sixth trial shows that the peremptory strike of at least one of the black prospective jurors (Carolyn Wright) was motivated in substantial part by discriminatory intent. As this Court has stated, the Constitution forbids striking even a single prospective juror for a discriminatory purpose. See Foster, 578 U. S., at ----, 136 S.Ct., at 1747.
Comparing prospective jurors who were struck and not struck can be an important step in determining whether a Batson violation occurred. See Snyder , 552 U.S. at 483-484, 128 S.Ct. 1203 ; Miller-El II , 545 U.S. at 241, 125 S.Ct. 2317. The comparison can suggest that the prosecutor's proffered explanations for striking black prospective jurors were a pretext for discrimination. When a prosecutor's "proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to *2249 serve, that is evidence tending to prove purposeful discrimination." Foster , 578 U. S., at ----, 136 S.Ct., at 1754 (quotation altered). Although a defendant ordinarily will try to identify a similar white prospective juror whom the State did not strike, a defendant is not required to identify an identical white juror for the side-by-side comparison to be suggestive of discriminatory intent. Miller-El II , 545 U.S. at 247, n. 6, 125 S.Ct. 2317.
In this case, Carolyn Wright was a black prospective juror who said she was strongly in favor of the death penalty as a general matter. And she had a family member who was a prison security guard. Yet the State exercised a peremptory strike against Wright. The State said it struck Wright in part because she knew several defense witnesses and had worked at Wal-Mart where Flowers' father also worked.
Winona is a small town. Wright had some sort of connection to 34 people involved in Flowers' case, both on the prosecution witness side and the defense witness side. See, 240 So.3d at 1126. But three white prospective jurors-Pamela Chesteen, Harold Waller, and Bobby Lester-also knew many individuals involved in the case. Chesteen knew 31 people, Waller knew 18 people, and Lester knew 27 people. See ibid. Yet as we explained above, the State did not ask Chesteen, Waller, and Lester individual follow-up questions about their connections to witnesses. That is a telling statistic. If the State were concerned about prospective jurors' connections to witnesses in the case, the State presumably would have used individual questioning to ask those potential white jurors whether they could remain impartial despite their relationships. A "State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." Miller-El II , 545 U.S. at 246, 125 S.Ct. 2317 (internal quotation marks omitted).
Both Carolyn Wright and Archie Flowers, who is the defendant's father, had worked at the local Wal-Mart. But there was no evidence that they worked together or were close in any way. Importantly, the State did not ask individual follow-up questions to determine the nature of their relationship. And during group questioning, Wright said she did not know whether Flowers' father still worked at Wal-Mart, which "supports an inference that Wright and Flowers did not have a close working relationship." 240 So.3d at 1163 (King, J., dissenting). And white prospective jurors also had relationships with members of Flowers' family. Indeed, white prospective juror Pamela Chesteen stated that she had provided service to Flowers' family members at the bank and that she knew several members of the Flowers family. App. 83. Likewise, white prospective juror Bobby Lester worked at the same bank and also encountered Flowers' family members. Id ., at 86. Although Chesteen and Lester were questioned during group voir dire , the State did not ask Chesteen or Lester individual follow-up questions in order to explore the depth of their relationships with Flowers' family. And instead of striking those jurors, the State accepted them for the jury. To be sure, both Chesteen and Lester were later struck by the defense. But the State's acceptance of Chesteen and Lester necessarily informs our assessment of the State's intent in striking similarly situated black prospective jurors such as Wright.
The State also noted that Wright had once been sued by Tardy Furniture for collection of a debt 13 years earlier. Id ., at 209. Wright said that the debt was paid off and that it would not affect her evaluation *2250 of the case. Id ., at 71, 90-91. The victims in this case worked at Tardy Furniture. But the State did not explain how Wright's 13-year-old, paid-off debt to Tardy Furniture could affect her ability to serve impartially as a juror in this quadruple murder case. The "State's unsupported characterization of the lawsuit is problematic." 240 So.3d at 1163 (King, J., dissenting). In any event, the State did not purport to rely on that reason alone as the basis for the Wright strike, and the State in this Court does not rely on that reason alone in defending the Wright strike.
The State also explained that it exercised a peremptory strike against Wright because she had worked with one of Flowers' sisters. App. 209. That was incorrect. The trial judge immediately stated as much. Id ., at 218-219. But incorrect statements of that sort may show the State's intent: When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent.
That incorrect statement was not the only one made by the prosecutor. The State made apparently incorrect statements to justify the strikes of black prospective jurors Tashia Cunningham, Edith Burnside, and Flancie Jones. The State contradicted Cunningham's earlier statement that she had only a working relationship with Flowers' sister by inaccurately asserting that Cunningham and Flowers' sister were close friends. See id ., at 84, 220. The State asserted that Burnside had tried to cover up a Tardy Furniture suit. See id ., at 226. She had not. See id ., 70-71. And the State explained that it struck Jones in part because Jones was Flowers' aunt. See id., at 229. That, too, was not true. See id ., at 86-88. The State's pattern of factually inaccurate statements about black prospective jurors suggests that the State intended to keep black prospective jurors off the jury. See Foster , 578 U. S., at ----, 136 S.Ct., at 1754 ; Miller-El II , 545 U.S. at 240, 245, 125 S.Ct. 2317.
To be sure, the back and forth of a Batson hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination. But when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling. So it is here.
The side-by-side comparison of Wright to white prospective jurors whom the State accepted for the jury cannot be considered in isolation in this case. In a different context, the Wright strike might be deemed permissible. But we must examine the whole picture. Our disagreement with the Mississippi courts (and our agreement with Justice King's dissent in the Mississippi Supreme Court) largely comes down to whether we look at the Wright strike in isolation or instead look at the Wright strike in the context of all the facts and circumstances. Our precedents require that we do the latter. As Justice King explained in his dissent in the Mississippi Supreme Court, the Mississippi courts appeared to do the former. 240 So.3d at 1163-1164. As we see it, the overall context here requires skepticism of the State's strike of Carolyn Wright. We must examine the Wright strike in light of the history of the State's use of peremptory strikes in the prior trials, the State's decision to strike five out of six black prospective jurors at Flowers' sixth trial, and the State's vastly disparate questioning of black and white prospective jurors during jury selection at the sixth trial. We cannot just look away. Nor can we focus on the Wright strike in isolation. In light of all the facts and circumstances, we conclude that the trial court clearly erred in ruling *2251 that the State's peremptory strike of Wright was not motivated in substantial part by discriminatory intent.
* * *
In sum, the State's pattern of striking black prospective jurors persisted from Flowers' first trial through Flowers' sixth trial. In the six trials combined, the State struck 41 of the 42 black prospective jurors it could have struck. At the sixth trial, the State struck five of six. At the sixth trial, moreover, the State engaged in dramatically disparate questioning of black and white prospective jurors. And it engaged in disparate treatment of black and white prospective jurors, in particular by striking black prospective juror Carolyn Wright.
To reiterate, we need not and do not decide that any one of those four facts alone would require reversal. All that we need to decide, and all that we do decide, is that all of the relevant facts and circumstances taken together establish that the trial court at Flowers' sixth trial committed clear error in concluding that the State's peremptory strike of black prospective juror Carolyn Wright was not motivated in substantial part by discriminatory intent. In reaching that conclusion, we break no new legal ground. We simply enforce and reinforce Batson by applying it to the extraordinary facts of this case.
We reverse the judgment of the Supreme Court of Mississippi, and we remand the case for further proceedings not inconsistent with this opinion.
It is so ordered.