# SUPREME COURT OF THE UNITED STATES

## DILLION GAGE COMPTON *v.* TEXAS

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS OF TEXAS

No. 23–5682.   Decided April 15, 2024

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, dissenting from the denial of certiorari.

"The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers* v. *Mississippi*, 588 U. S. 284, 303 (2019). A pattern of strikes against jurors with the same race or sex suggests that a prosecutor is striking jurors based on impermissible stereotypes about those protected characteristics rather than the juror's individual views. "More powerful than these bare statistics, however, are side-by-side comparisons of [jurors with certain protected characteristics] who were struck and [jurors without those characteristics] allowed to serve." *Miller-El* v. *Dretke*, 545 U. S. 231, 241 (2005). "If a prosecutor's proffered reason for striking a [female] panelist applies just as well to an otherwise-similar [male] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Ibid.* A prosecutor may claim that he is striking a woman based on her hesitation to impose the death penalty. When the prosecutor fails to strike a man who has expressed even greater hesitancy, however, it indicates that the woman was struck based on unconstitutional stereotypes about women rather than objective facts.

In this capital case, prosecutors used 13 of their 15 peremptory strikes on women. They offered only one justification in each case: the woman's views on the death penalty. In reviewing the challenged jurors, the Texas Court of Criminal Appeals (TCCA) failed to conduct a side-by-side

comparison. Instead, it tested the prosecution's justification in the aggregate, looking to the women's views on capital punishment as a group instead of individually. That legal error hid the best indication of discriminatory purpose. Under a side-by-side comparison, it is clear that at least one woman struck by the State had more favorable views on the death penalty than at least one man the State did not strike. I would summarily vacate the decision below and remand for the TCCA to apply the proper comparative analysis.

## I
### A

Dillion Gage Compton was charged with capital murder for the death of a prison guard. After *voir dire*, there were 42 qualified venirepersons for a 12-person jury. Of those 42 potential jurors, 23 were women and 19 were men, making the initial pool 55% women. The State used 13 of its 15 strikes on women. After both sides submitted their strikes, the 12-person jury consisted of only four women and eight men, or 33% women.

Compton challenged the State's peremptory strikes based on *J. E. B.* v. *Alabama ex rel. T. B.*, 511 U. S. 127 (1994), arguing that the State had discriminated based on gender. In response, the prosecutor explained he was "certainly focused almost single-han[dedly] on the issue of the death penalty." 21 Tr. 16 (Sept. 25, 2018). The defense objected that the "gender basis has not been explained to the Court sufficiently." *Id.*, at 18. The trial court denied the challenge.

After trial, the jury convicted Compton of capital murder. The trial court sentenced him to death.

### B

On appeal, Compton again challenged the State's per-

emptory strikes under *J. E. B.* Compton identified four female potential jurors struck by the State for whom the record allegedly did not support the State's rationale. He identified three male potential jurors who expressed views on the death penalty as or less favorable than the struck women. The State defended its views-on-the-death-penalty rationale for each struck woman but never compared their views with those of the men it did not strike. Thus, it did not respond to Compton's comparative argument that the State had retained men with similar views on the death penalty to the struck women.

In evaluating the *J. E. B.* challenge, the TCCA determined that Compton had made a prima facie showing of bias under the first step of *Batson* v. *Kentucky*, 476 U. S. 79 (1986). Under the second step, the court reasoned that the State had provided a gender-neutral reason for the strikes: that "each individual . . . expressed more concern, hesitation, or opposition to imposing the death penalty than those venirepersons the State chose not to strike." 666 S. W. 3d 685, 711 (Tex. Crim. App. 2023).

In examining whether that reason was pretextual under the third step, the TCCA found the "statistical evidence . . . concerning." *Ibid.* It noted that the State's use of 13 of 15 peremptory strikes against women combined with "the fact that only four women made it onto the jury despite the panel having more women than men does raise concerns." *Ibid.*

The court then purported to examine "[s]ide-by-side comparisons of stricken and accepted venirepersons." *Ibid.* It declined to "engag[e] in an exhaustive comparative analysis of each prospective juror." *Ibid.* Despite claiming to "[c]ompar[e] [the male] venirepersons to the female venirepersons struck by the State," *id*., at 712, the TCCA failed to examine individually the four female potential jurors identified by

Compton as having favorable views on the death penalty.[1]
Instead, it conducted its analysis entirely in the aggregate.
It concluded that "the State was, in fact, focused on death-
penalty issues and struck *most* of the female venirepersons
based on their responses" that indicated reservations about
the death penalty. *Id.*, at 711 (emphasis added). The TCCA
reasoned by bullet point that:

- "*Most* of the State-stricken female venirepersons rated
  themselves a three or four on a scale of one-to-six when
  asked about their support for the death penalty;
- "*Most* said they were generally opposed to the death
  penalty except in a few cases, or that they were neutral
  on the appropriateness of the death penalty;
- "*Nearly all* disagreed that the death penalty 'gives the
  criminal what they deserve;'
- "*Nearly all* expressed some favorable views about the
  option of life without parole, the possibility of rehabili-
  tation, religious redemption, and/or the fact that life
  without parole forces offenders to live with the conse-
  quences of their crimes;
- "*Nearly all* agreed that life without parole could be an
  adequate punishment for capital murder;
- "*Some, but not all*, emphasized a defendant's back-
  ground and upbringing as relevant factors in assessing
  whether the death penalty versus life without parole
  was appropriate." *Id.*, at 711–712 (emphasis added).

────────────

[1] The TCCA knew how to conduct a side-by-side comparison. Compton
also challenged three strikes based on *Batson* v. *Kentucky*, 476 U. S. 79
(1986), arguing that the State discriminated based on race. The State
struck one Black man, one Black woman, and one Hispanic man. The
resulting 12-person jury included 1 Hispanic man and 11 white people.
The TCCA conducted side-by-side comparisons of the struck jurors and
three unstruck white male comparators. See 666 S. W. 3d, at 700–710.
It inexplicably failed to do so for the *J. E. B.* challenge, which required
equally scrupulous consideration.

The TCCA held that "[c]omparatively speaking, the venirepersons—men and women—who were not struck by the State *generally* expressed more favorable views towards the death penalty and less favorable views towards the life-without-parole option and mitigating evidence than did the female venirepersons described above." *Id.*, at 712 (emphasis added). It distinguished the three male comparators not struck by the State as "*overall* favorable for the State's preferred punishment." *Ibid.* (emphasis added). It rejected Compton's *J. E. B.* claim and affirmed the trial court's judgment of conviction and sentence of death.

## II

This Court has repeatedly emphasized that the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers*, 588 U. S., at 303; *Foster* v. *Chatman*, 578 U. S. 488, 499 (2016); *Snyder* v. *Louisiana*, 552 U. S. 472, 478 (2008). Challenges to jury selection based on unconstitutional proxies like race, see *Batson*, 476 U. S., at 96, or gender, see *J. E. B.*, 511 U. S., at 128, exist to protect the equal protection rights of "potential jurors, as well as [defendants], . . . to jury selection procedures that are free from state-sponsored group stereotypes," *ibid.* These challenges guard against prosecutorial bias: not only the perception that a prospective juror might favor a defendant because they share a protected characteristic, but that a prospective juror might hold a particular view because of a stereotype based on race or gender. See *id.*, at 141–142; *Batson*, 476 U. S., at 104–105 (Marshall, J., concurring).

The third step of this Court's test in particular protects against impermissible stereotypes by checking the State's proffered reason against its other decisions. "If a prosecutor's proffered reason for striking a [female] panelist applies just as well to an otherwise-similar [male] who is permitted

to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Dretke*, 545 U. S., at 241.

Here, the TCCA failed to conduct that important side-by-side comparison of struck female jurors against male jurors permitted to serve. Before the trial court, the TCCA, and this Court, the State offered only one reason for striking these women: their hesitations about imposing the death penalty. If a struck female panelist's views on the death penalty were more favorable than an otherwise-similar man permitted to serve, that would be strong evidence of invidious discrimination under *Batson*'s third step. Yet the TCCA evaluated the strikes only in the aggregate, reasoning that "most" or "nearly all" struck women expressed views less favorable toward the death penalty than the men permitted to serve. That analysis directly contradicts the principle that striking even one prospective juror for a discriminatory reason violates the Constitution.

Considering only one example in this record suggests that the prosecutor's proffered reason was pretextual. V. P., a female juror struck by the prosecutors, strongly supported capital punishment. V. P. rated herself a five out of six in terms of her support for the death penalty. She endorsed punishment as more important than rehabilitation and agreed that capital punishment was "absolutely justified" and "just and necessary." 14 Record 5912. She was "concern[ed]" about life in prison instead of the death penalty because sometimes the prisoner could "continu[e] to do harm to others while in prison." *Id.*, at 5914. When questioned about mitigation during *voir dire*, she said that reading the mitigation special issues made her angry, because "some people use just whatever—you know, they blame—I don't like the blame game." 17 Tr. 180 (Sept. 17, 2018).

In contrast, the State did not strike a male prospective juror who expressed less favorable views of the death pen-

alty. That prospective juror, P. K., wrote that he was op-
posed to the death penalty except in some cases, and that
he would be "very conflicted" about returning a verdict of
death, underlining "very" for emphasis. 12 Record 5252,
5256. He agreed that "[c]apital punishment is not neces-
sary in modern civilization" and embraced the idea that
"[e]xecution of criminals is a disgrace to civilized society."
*Id.*, at 5257. He thought that Texas used the death penalty
"too often." *Id.*, at 5261.

This case illustrates the hazards of analysis by aggregate.
The TCCA may have been right that most of the struck
women expressed less favorable views on the death penalty
than most of the men permitted to serve. When the State,
however, extends a reason true of many female potential
jurors to another female potential juror not based on what
she says, but based on the fact that she is a woman, it
crosses the line into invidious discrimination. Just because
most female potential jurors had hesitations about the
death penalty does not mean that V. P. did.

The State never offered any justification other than fe-
male potential jurors' views on the death penalty for its
strikes.[2] The TCCA erred when it allowed the views of
other female prospective jurors to infect its assessment of
the State's justification for V. P.'s strike.

––––––––––

[2] In the State's brief before the TCCA, it emphasized that V. P. "was
struck by the State and the defense." Brief for Appellee in No. AP–
77,087, p. 47. A strike by the defense, however, is irrelevant to a *Batson*
or *J. E. B.* inquiry, which focuses "solely on evidence concerning the pros-
ecutor's exercise of peremptory challenges." *Batson*, 476 U. S., at 96; see
also *Miller-El* v. *Dretke*, 545 U. S. 231, 255, n. 14 (2005) ("[Defendant's]
shuffles are flatly irrelevant to the question whether prosecutors' shuf-
fles revealed a desire to exclude blacks"). Indeed, it makes sense that
Compton sought to exclude a juror like V. P. who expressed such pro-
death penalty views. Moreover, this evidence of potential bias against
V. P. could have informed the challenges against the three other struck
women Compton identified.

*      *      *

"America's trial judges operate at the front lines of American justice." *Flowers*, 588 U. S., at 302. They bear "the primary responsibility to enforce *Batson* and prevent . . . discrimination from seeping into the jury selection process." *Ibid.* That responsibility requires scrutinizing the prosecutor's proffered reason for a peremptory strike by comparing any struck juror challenged by the defense with a retained juror who does not share the same protected characteristic. When a court conducts a *Batson* or *J. E. B.* inquiry not based on individual comparisons but by aggregate, it too runs the risk of generalizing based on impermissible stereotypes. I would summarily vacate the decision below and remand for the TCCA to correct its legally erroneous analysis with respect to the *J. E. B.*-challenged jurors. I respectfully dissent.