Argued and submitted December 30, 2021; conviction on Count 2 reversed and remanded, remanded for resentencing, otherwise affirmed March 9; petition for review denied July 7, 2022 (370 Or 56)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KYLE WAYNE VANDYKE,
*Defendant-Appellant.*

Deschutes County Circuit Court
17CR07565; A171426

507 P3d 339

Beth M. Bagley, Judge.

Sarah De La Cruz, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Armstrong, Senior Judge.

PER CURIAM

Conviction on Count 2 reversed and remanded; remanded for resentencing; otherwise affirmed.

Aoyagi, J., concurring.

## PER CURIAM

Defendant was convicted of attempted assault of a public safety officer (Count 2), driving under the influence of intoxicants (Count 3), resisting arrest (Count 4), interfering with a peace officer (Count 5), reckless endangerment with a motor vehicle (Count 6), and reckless driving (Count 7). Counts 2 through 5 were tried to a jury, while Counts 6 and 7 were tried to the court. On appeal, defendant raises four assignments of error, which we address in reverse order.

*Third and fourth assignments of error.* Defendant contends that the trial court erred by instructing the jury that it could return nonunanimous guilty verdicts and by accepting a nonunanimous guilty verdict on Count 2. The giving of the instruction was error. *See Ramos v. Louisiana*, 590 US \_\_\_, 140 S Ct 1390, 206 L Ed 2d 583 (2020) (holding that, under the Sixth Amendment, a criminal defendant may be convicted of a serious offense only by unanimous verdict). We therefore reverse defendant's conviction on Count 2. However, we reject defendant's argument as to the convictions for which the jury returned unanimous verdicts. *See State v. Kincheloe*, 367 Or 335, 339, 478 P3d 507 (2020), *cert den*, \_\_\_ US \_\_\_, 141 S Ct 2837, 210 L Ed 2d 951 (2021) (holding that same instruction was harmless where jury returned unanimous verdicts).

*Second assignment of error.* Defendant challenges the denial of his motion to suppress. The trial court concluded that exigent circumstances justified a police officer reaching through the doorway of defendant's home to grab defendant's arm and pull him outside. Having reviewed the record and the pertinent authorities, we reject the second assignment of error on the merits without written discussion.

*First assignment of error.* Defendant challenged one of the prosecutor's peremptory strikes under *Batson v. Kentucky*, 476 US 79, 106 S Ct 1712, 90 L Ed 2d 69 (1986). He contends that the trial court erred in overruling his *Batson* objection.

Resolving a *Batson* objection has three steps. First, defendant was required to make a *prima facie* showing that the peremptory strike was based on race, a standard that is

"not high." *State v. Curry*, 298 Or App 377, 381-82, 447 P3d 7 (2019), *adh'd to on recons*, 302 Or App 640, 461 P3d 1106 (2020). Once that showing was made, second, the burden shifted to the state to provide a race-neutral explanation for the peremptory strike. *Id*. If the state met that burden, then, third, the trial court had to "'consult all of the circumstances that bear on racial animosity'" and determine whether defendant had "shown purposeful discrimination by the state." *Id*. (quoting *Snyder v. Louisiana*, 552 US 472, 478, 128 S Ct 1203, 170 L Ed 2d 175 (2008)).

We review a trial court's determination that a peremptory strike was not the product of purposeful racial discrimination as a question of fact. *Curry*, 298 Or App at 389. We will reverse only if the court committed "clear error." *Snyder*, 552 US at 477 ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.").

Here, the prosecutor used a peremptory strike to remove a Hispanic[1] man, whom defendant contends was the only person of color on the jury panel and which resulted in defendant (who is Native American) being tried by an all-white jury. Defendant made a *Batson* objection to the strike. In response, the prosecutor explained that he preferred jurors with "executive level, managerial-level" work experience for this case. The Hispanic man worked at McDonalds, and the prosecutor used other peremptory strikes to remove a hairdresser and another McDonalds employee. The trial court found that the prosecutor's proffered reason was not a pretext for purposeful racial discrimination. Accordingly, it overruled defendant's *Batson* objection.

On appeal, defendant contends that the trial court erred. He argues that, "although the prosecutor's stated reason appeared to be facially race-neutral, it was a pretext for racial discrimination because it disproportionately affects racial minorities and is not related to the facts or issues in this case." He further argues that the prosecutor's explanation does not hold up when one compares the Hispanic man to white jurors who were not stricken and when one

---

[1] Both parties describe the stricken juror as "Hispanic," so we use that term.

considers the prosecutor's lack of questioning regarding managerial experience. Ultimately, defendant argues that, on this record, the court could not find that the state established a race-neutral reason for striking the Hispanic man.

The state responds that the court correctly overruled the *Batson* objection, because the prosecutor provided a race-neutral explanation for the strike, "specifically, the prosecutor's belief that jurors who had management-level job experience would be more willing to 'hold someone accountable for their behavior' than a juror who lacked that experience." The state argues that the trial court's finding that the explanation was not a pretext for purposeful discrimination is binding, because it is supported by the record, and that the court did not clearly err by crediting the prosecutor's explanation.

We agree with the state that, under the standard established in *Batson*, and given our standard of review, the trial court did not err. *Batson* permits a trial court to reject a facially race-neutral reason for exercising a peremptory strike only if it finds the stated reason to be a pretext for purposeful racial discrimination. If the reason given is facially race-neutral, and the trial court determines that it is not a pretext for purposeful discrimination (on a record that allows that finding), then a *Batson* objection will fail, even if the stated reason has a disproportionate effect based on race. In this case, the prosecutor provided a race-neutral explanation for the challenged strike, the trial court found that the reason given was not a pretext for purposeful racial discrimination, and the record permits that finding.

We also are unpersuaded by defendant's arguments regarding comparative-juror analysis and the prosecutor's lack of questioning regarding managerial experience. As to the former, defendant did not make a comparative-juror argument to the trial court, the trial court did not engage in such an analysis, and we cannot meaningfully engage in such an analysis for the first time on appeal on this record. *See Curry*, 298 Or App at 382 (recognizing that an appellate court may engage in comparative-juror analysis for the first time on appeal, but only if the record allows for it). The *voir dire* transcript frequently does not identify the specific

prospective juror answering a question, instead identifying some speakers only as "prospective juror." We cannot engage in a meaningful comparative analysis on that record. As for the latter argument, the prosecutor did not specifically ask prospective jurors about their managerial experience, but he had information about their employment history, and defense counsel asked about accountability and asked for a show of hands as to who had "been in a managerial role at work." The prosecutor therefore had that information at the time that he exercised his peremptory strikes.

Accordingly, we reject the first assignment of error.[2]

Conviction on Count 2 reversed and remanded; remanded for resentencing; otherwise affirmed.

**AOYAGI, J.,** concurring.

I agree with the majority's disposition and reasoning. I write separately to draw attention to the fact that, with the passage of time, the procedural mechanism crafted in *Batson v. Kentucky*, 476 US 79, 106 S Ct 1712, 90 L Ed 2d 69 (1986), to root out racial discrimination in jury selection—specifically in the use of peremptory strikes—has proven demonstrably not up to the task. Whatever other means may exist to get at the problem,[1] it is critical to keep in mind that discrimination in jury selection has long been recognized by the United States Supreme Court as a problem of *constitutional* magnitude. It therefore deserves ongoing constitutional attention.

---

[2] We note that defendant's argument is confined to the federal constitution and *Batson*. Defendant has not made any argument under the Oregon Constitution.

[1] For example, in 2018, Washington State adopted a court rule that created a new procedure for challenging peremptory strikes that differs from *Batson*'s procedure. The rule applies to all jury trials and is intended "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." Wash GR 37 (court rule); *see also State v. Curry*, 298 Or App 377, 389, 447 P3d 7 (2019), *adh'd to on recons*, 302 Or App 640, 461 P3d 1106 (2020) (noting the Washington rule and positing that it might be appropriate for the Oregon Council on Court Procedures or the Oregon legislature to consider a similar rule); *State v. Holmes*, 334 Conn 202, 205-06, 221 A3d 407, 411 (2019) (affirming rejection of *Batson* challenge under existing case law, but "refer[ring] the systemic concerns about *Batson*'s failure to address the effects of implicit bias and disparate impact to a Jury Selection Task Force, appointed by the Chief Justice, to consider measures intended to promote the selection of diverse jury panels in [Connecticut's] courthouses").

It is long-established that, under the Equal Protection Clause of the United States Constitution, "a litigant has the right not to have potential jurors of the same race excluded from the jury on account of race" and, further, that "[e]very potential juror who shows up at the courthouse for jury service has 'the right not to be excluded from [a jury] on account of race.'" *State v. Curry*, 298 Or App 377, 381-82, 447 P3d 7 (2019), *adh'd to on recons*, 302 Or App 640, 461 P3d 1106 (2020) (discussing *Batson*; quoting *Powers v. Ohio*, 499 US 400, 409, 111 S Ct 1364, 113 L Ed 2d 411 (1991)). By "requiring trial courts to be sensitive to the racially discriminatory use of peremptory challenges, [*Batson*] enforces the mandate of equal protection and furthers the ends of justice." *Batson*, 476 US at 99.

Faced with the unconstitutionality of peremptory challenges being used in a racially discriminatory manner, the Supreme Court set out in *Batson* to establish a procedural mechanism to detect and prevent such discrimination. Ultimately, the Court settled on a three-step, burden-shifting procedure that allows "prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." *Hernandez v. New York*, 500 US 352, 358, 111 S Ct 1859, 114 L Ed 2d 395 (1991). In short, "once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved *purposeful racial discrimination*." *Purkett v. Elem*, 514 US 765, 767, 115 S Ct 1769, 131 L Ed 2d 834 (1995) (emphasis added).

The focus on purposeful discrimination dates back to 1880. In *Strauder v. State of West Virginia*, 100 US 303, 305, 25 L Ed 664 (1880), the Court reversed the defendant's criminal conviction after trial by an all-white jury, where a state statute expressly allowed only "white male persons" to serve as jurors. The Court framed the issue as whether, in seating a jury by whom a "colored man" is to be tried, "all persons of his race or color may be excluded by law, solely because of their race or color, so that by no possibility can

any colored man sit upon the jury." *Id*. After describing the historical context for and purposes of the Fourteenth Amendment—with a focus on the rampant and habitual discrimination based on race that existed at the time—the Court held that it violated equal protection to exclude all nonwhite men from juries. *Id*. at 306-10.

Over the next century, the Court "consistently and repeatedly reaffirmed" the constitutional principle from *Strauder* in "numerous decisions." *Batson*, 476 US at 84 (internal quotation marks omitted). In doing so, the Court generally spoke in terms of "purposeful" discrimination of the sort seen in *Strauder* in 1880. In 1965, the Court described *Strauder* as standing for the principle that, "[a]lthough a Negro defendant is not entitled to a jury containing members of his race, a State's *purposeful or deliberate* denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." *Swain v. Alabama*, 380 US 202, 203-04, 85 S Ct 824, 13 L Ed 2d 759 (1965) (emphasis added). In 1986, in *Batson*, the Court similarly described *Strauder* as providing "that the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been *purposefully excluded.*" *Batson*, 476 US at 85 (emphasis added). That narrow articulation of the constitutional principle was then directly incorporated into the *Batson* procedure. *See id.* at 97-98.

At the same time, the Court has spoken in broad terms about the need to eliminate racial discrimination in jury selection. *Batson* describes *Strauder* as the beginning of the Court's "unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn." *Id.* at 85. And, in 2019, the Court stated that the United States Constitution "forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 588 US ___, ___, 139 S Ct 2228, 2242, 204 L Ed 2d 638 (2019).

Yet, the Court continues to apply the procedure adopted in *Batson*, which focuses only on purposeful discrimination. *See id*. In *Flowers*, the Court gave this description of *Batson*, its purpose, and its effect:

"Equal justice under law requires a criminal trial free of racial discrimination in the jury selection process. Enforcing that constitutional principle, *Batson* ended the widespread practice in which prosecutors could (and often would) routinely strike all black prospective jurors in cases involving black defendants. By taking steps to eradicate racial discrimination from the jury selection process, *Batson* sought to protect the rights of defendants and jurors, and to enhance public confidence in the fairness of the criminal justice system. *Batson* immediately revolutionized the jury selection process that takes place every day in federal and state criminal courtrooms throughout the United States.

"In the decades since *Batson*, this Court's cases have vigorously enforced and reinforced the decision, and guarded against any backsliding. Moreover, the Court has extended *Batson* in certain ways. A defendant of any race may raise a *Batson* claim, and a defendant may raise a *Batson* claim even if the defendant and the excluded juror are of different races. Moreover, *Batson* now applies to gender discrimination, to a criminal defendant's peremptory strikes, and to civil cases."

*Id.* at ___, 139 S Ct at 2242-43 (internal citations omitted).

There is no question that *Batson* was groundbreaking in its effort to craft a procedural mechanism to address the constitutional problem of racial discrimination in jury selection, specifically as related to peremptory challenges. There is also no question that the fundamental principle animating *Batson*—and the long line of Supreme Court cases from *Strauder* to *Flowers*—is rock solid. The challenge, as is so often the case, is in the application. *See Batson*, 476 US at 89-90 ("The principles announced in *Strauder* never have been questioned in any subsequent decision of this Court. Rather, the Court has been called upon repeatedly to review the application of those principles to particular facts."). Even groundbreaking approaches may become outdated.

In the 35 years since *Batson* was decided, let alone the nearly 150 years since *Strauder* was decided, our understanding of racial discrimination—including what drives it, how it functions, and what would need to be done to eradicate it—has significantly changed and deepened. For example, as explicit bias has become less socially acceptable, the role of *implicit* bias has become much better understood. Unlike

purposeful discrimination, implicit bias is "unconscious discrimination" that "occurs, almost inevitably, because of normal cognitive processes that form stereotypes." Anthony Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 BUL Rev 155, 180 (2005). Yet *Batson*'s procedure for rooting out racial discrimination in peremptory challenges remains fixed on "purposeful discrimination." *Batson*, 476 US at 85.

Premised on the assumption that racism is intentional, the *Batson* procedure is extremely ill-suited to addressing implicit bias. It takes aim at deliberate racism, while allowing very little to be done about the exercise of peremptory challenges by lawyers who do not mean to discriminate based on race but who may do so unconsciously—to the same ultimate effect of unconstitutionally removing jurors based on race. As one commentator has put it, "If the *Batson* procedure's goal is to eliminate racial and gender discrimination in the selection of juries, then the crucial question regarding that discrimination should not be whether the attorney was consciously discriminating—this article assumes that most attorneys act in good faith—but rather whether the attorney would have challenged the potential juror but for the juror's race or gender." Page, 85 BUL Rev at 159-60.

Unless reimagined, *Batson* will never live up to its stated purpose of "eradicat[ing] racial discrimination" in jury selection. *Batson*, 476 US at 85. It will not even come close. Moreover, because of how *Batson* is framed, we will continue to hamstring the ability of trial courts to effectively address racial discrimination in jury selection, keeping them in an artificial position where they can only address an equal-protection problem if they can say—and are willing to say—that a lawyer and officer of the court is engaging in *purposeful* racial discrimination. Any efforts to address implicit bias within the existing *Batson* framework run straight into that reality.[2]

---

[2] In this case, the prosecutor's explanation for the challenged strike was a preference for jurors with "executive level, managerial-level" job experience, who he believed would be more willing to "hold someone accountable for misbehavior" than a juror who lacked that experience. As defendant argues, given socioeconomic realities in our country, that type of facially race-neutral explanation is likely to have a disparate effect on potential jurors who are not white, and it could

I am *far* from the first person to recognize this problem. When *Batson* was decided, Justice Marshall wrote a concurrence in which he anticipated that *Batson* would "not end the illegitimate use of the peremptory challenge" and noted that trial courts are "ill equipped to second-guess" the facially race-neutral reasons that may be provided for striking a juror. *Batson*, 476 US at 105-06 (Marshall, J., concurring). He also pointed out the risk of implicit bias among both lawyers and judges, stating that "[a] prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically," and that "[a] judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported." *Id.* at 106. Thus, "[e]ven if all parties approach the Court's mandate [in *Batson*] with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels—a challenge I doubt all of them can meet." *Id.*

Twenty years later, Justice Breyer made similar observations—with the benefit of two decades of watching *Batson* being applied—in *Miller-El v. Dretke*, 545 US 231, 266, 125 S Ct 2317, L Ed 2d 196 (2005) (Breyer, J., concurring). Justice Breyer described how *Miller-El* demonstrated the "practical problems of proof" created by the *Batson* procedure. *Id.* at 267. He also observed that, despite the promise of *Batson*, the "use of race- and gender-based stereotypes in the jury-selection process seems better organized and more systematized than ever before." *Id.* at 270 (discussing articles and studies). He identified the third step of *Batson* as particularly problematic, in that it "asks judges to engage in the awkward, sometimes hopeless, task of second-guessing a prosecutor's instinctive judgment—the underlying basis for which may be invisible even to the prosecutor exercising the challenge." *Id.* at 267-68.

Some state courts have also acknowledged *Batson*'s shortcomings. Most notably, in 2013, the Washington Supreme

---

also potentially reflect implicit bias. When the procedure designed to ensure equal protection targets only purposeful discrimination, however, the court is unable to even ask the right questions to get to implicit bias.

Court pointed to "a growing body of evidence [that] shows that racial discrimination remains rampant in jury selection"—in part because *Batson* "recognizes only 'purposeful discrimination,' whereas racism is often unintentional, institutional, or unconscious"—and concluded that *Batson* procedures are not "robust enough to effectively combat race discrimination in the selection of jurors." *State v. Saintcalle*, 178 Wash 2d 34, 35-36, 309 P3d 326, 335 (2013). That led the court to eventually modify the *Batson* procedure, first in *City of Seattle v. Erickson*, 188 Wash 2d 721, 391 P3d 1124 (2017), and then again in *State v. Jefferson*, 192 Wash 2d 225, 429 P3d 467 (2018). In *Jefferson*, 192 Wash 2d at 229-30, the court essentially replaced the third *Batson* step with a new inquiry into "whether an objective observer could view race or ethnicity as a factor in the use of the peremptory strike"; if so, the strike must be denied, and appellate review is *de novo*. When *Jefferson* was decided, Washington had already adopted General Rule 37, creating new peremptory-challenge procedures by court rule. *Jefferson*, 192 Wash 2d at 243; *see also* 318 Or App at 239 n 1 (Aoyagi, J., concurring) (discussing Washington rule). However, that court rule was not in effect at the time of the defendant's trial in *Jefferson*, so the court proceeded to address the issue as a constitutional question. *Jefferson*, 192 Wash 2d at 249.

Finally, commentators have levelled their own criticisms at the limitations of the *Batson* procedure, including expressing concern that it may actually worsen the effect of implicit bias. *See* Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated* Voir Dire*, the Failed Promise of* Batson, *and Proposed Solutions*, 4 Harv L & Policy Rev 149, 150 (2010) (The "judge-dominated *voir dire* and the *Batson* challenge process are well-intentioned methods of attempting to eradicate bias from the judicial process, but they actually perpetuate legal fictions that allow implicit bias to flourish."); *see also, e.g.*, Willamette University College of Law Racial Justice Task Force, *Remedying* Batson*'s Failure to Address Unconscious Juror Bias in Oregon*, 57 Willamette L Rev 85 (2021); Lauren McLane, *Our Lower Courts Must Get In 'Good Trouble, Necessary Trouble,' and Desert Two Pillars of Racial Injustice*—Whren v. United States *and* Batson v.

Kentucky, 20 Conn Pub Int L J 181 (2021); Jeffrey Bellin & Junichi P. Semitsu, *Widening* Batson*'s Net to Ensnare More Than the Unapologetically Bigoted or Painfully Unimaginative Attorney*, 96 Cornell L Rev 1075 (2011); Page, 85 BUL Rev at 155.

While others have already called out *Batson*'s failure to account for implicit bias, that does not mean that we should not continue to call it out. "[S]triking even a single prospective juror for a discriminatory purpose" violates the Equal Protection Clause. *Flowers*, 588 US at ___, 139 S Ct at 2242. That is true whether the discriminatory purpose arises from explicit bias, implicit bias, or any other kind of bias. Moreover, while other approaches to addressing the problem are laudatory, a constitutional problem deserves constitutional attention. It is hardly unprecedented to revisit a procedure designed to effectuate a constitutional protection. Indeed, *Batson* itself "replaced the '"crippling burden"' of proof previously required under *Swain v. Alabama* when attempting to prove a racially motivated strike." *Jefferson*, 192 Wash 2d at 231 (quoting *Saintcalle*, 178 Wash 2d at 43-44 (quoting *Batson*, 476 US at 92-93)).

Something that the United States Supreme Court said over 80 years ago remains true today: "For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith v. State of Texas*, 311 US 128, 130, 61 S Ct 164, 85 L Ed 84 (1940). The time has come to revisit the procedural mechanism created in *Batson*, update it in light of our society's improved understanding of how racial discrimination occurs, and recommit to eradicating racial discrimination in jury selection as required by the Equal Protection Clause.

I respectfully concur.