**Opinion filed September 26, 2024**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00082-CR

_____

### YAHEL ELIYAH MCDANIEL, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 91st District Court**
**Eastland County, Texas**
**Trial Court Cause Nos. 25663, 25665, 25668, 25760, & 25960**

## O P I N I O N

Appellant, Yahel Eliyah McDaniel, was indicted in separate cause numbers for aggravated assault against a public servant, evading arrest or detention with a vehicle, unauthorized use of a vehicle, possession of a controlled substance, and aggravated robbery. *See* TEX. PENAL CODE ANN. § 22.02 (West Supp. 2023), § 38.04, § 31.07 (West 2016), § 29.03 (West 2019); TEX. HEALTH & SAFETY CODE

ANN. § 481.115 (West Supp. 2023). The cases were consolidated for trial.[1] Appellant pleaded guilty to evading arrest or detention with a vehicle, unauthorized use of a vehicle, and possession of methamphetamine in an amount of one gram or more but less than four grams. Appellant pleaded not guilty to aggravated assault against a public servant and aggravated robbery.

The jury convicted Appellant of each offense and assessed his punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for terms of forty years for aggravated assault, ten years for evading arrest or detention, ten years for possession of a controlled substance, thirty years for aggravated robbery, and two years in a state jail facility for unauthorized use of a vehicle. The trial court ordered that Appellant's sentences run concurrently.

Appellant's first court-appointed appellate counsel submitted an *Anders* brief and filed a motion to withdraw. *See Anders v. California*, 386 U.S. 738 (1967). Following the procedures set forth in *Anders*, *Kelly v. State*, 436 S.W.3d 313 (Tex. Crim. App. 2014), and *In re Schulman*, 252 S.W.3d 403 (Tex. Crim. App. 2008), we independently reviewed the record and concluded that this appeal was not particularly amenable to a disposition under *Anders*. We granted appellate counsel's motion to withdraw, abated the appeal, and remanded the cause to the trial court with instructions to appoint other appellate counsel. This appeal was reinstated after the trial court appointed new appellate counsel.

In four issues on appeal, Appellant asserts that the trial court: (1) abused its discretion in failing to find that the State's use of a peremptory strike was racially motivated; (2) committed charge error by including "good conduct time" language in the punishment charge from a repealed version of Article 37.07, Section 4(a) of

---

[1]We consolidated the separate appeals into a single cause number.

the Texas Code of Criminal Procedure; (3) abused its discretion by admitting extraneous offense evidence during guilt/innocence; and (4) erroneously failed to give a limiting instruction for the admitted extraneous offense evidence. We affirm.

*Background Facts*

Veronica Jo Seaton, the secretary of the First Baptist Church in Gorman, arrived at work and noticed people camping outside the church. Seaton testified that Appellant was one of the people she saw outside the church. Seaton called Billy Paul Miears, the chairman of deacons at the church, and told him about the people camping outside. Miears met Seaton at the church.

A short time later, Seaton noticed that the church's kitchen window was open and that there was water "shooting up" from the water line outside. Miears briefly left to get supplies to fix the water line. When Miears returned, he parked his vehicle by the water line so that he could easily access his tools, and then he repaired the water line. Afterwards, he and Seaton went into the kitchen to make sure that the water was working. Appellant walked into the kitchen behind them, introduced himself, and apologized for breaking the water line. Seaton left the kitchen to lock her office.

Miears testified that Appellant looked outside the kitchen door, noticed Miears's parked vehicle, and quickly walked outside. Miears followed Appellant after realizing that he had left his keys in the vehicle. Appellant entered Miears's vehicle, started it, and shifted gears before Miears reached inside and turned off the vehicle. A struggle over the keys ensued. When Seaton returned to the kitchen after securing her office, she saw Appellant and Miears fighting in Miears's vehicle. Seaton called 9-1-1.

3

During the struggle, the keys fell between the center console and driver's seat. Miears began trying to pull Appellant out of the driver's seat, but Appellant pushed Miears out of the vehicle, causing him to fall backwards onto the ground. Miears, who was sixty-six years old at the time, sustained broken glasses, a cut on his face, and an injured arm. Miears reentered the vehicle, "picked up some tools" from the backseat to "subdue" Appellant, but Appellant "bolted out of the [vehicle]."

After Appellant left Miears's vehicle, Seaton watched him get inside her vehicle. Appellant was unable to start Seaton's vehicle because she had the keys. Appellant, appearing aggravated, exited Seaton's vehicle and "fled." Deputy Barbara Fenley with the Eastland County Sheriff's Office arrived at the scene shortly after Appellant left.

Deputy Fenley noticed tools scattered out on the road. Two men came out of a nearby house and told Deputy Fenley that they worked for Elite Plumbing, and that their work vehicle was missing. One of the men told Deputy Fenley that there was a firearm in the console of the vehicle. Deputy Fenley notified dispatch that Appellant was possibly traveling in a white Elite Plumbing vehicle and that there was a firearm inside the vehicle's console.

Texas Department of Public Safety (DPS) Trooper Jose Astello was traveling on State Highway 6 responding to the assault call in Gorman when dispatch advised that Appellant was driving toward Eastland in a stolen, white, Elite Plumbing vehicle. After dispatch advised that the vehicle was last seen near Carbon, Trooper Astello turned his patrol unit around, facing north toward Eastland, and prepared to stop the vehicle. Trooper Astello watched the vehicle approaching in his rearview mirror, and his rear radar display showed that the vehicle was traveling at 100 miles per hour. Trooper Astello activated his emergency lights and siren as Appellant

4

drove the stolen vehicle toward him at 100 miles per hour. Appellant passed Trooper Astello without stopping, and Trooper Astello began pursuing the vehicle.

Trooper Astello testified that Appellant intentionally slammed on the brakes to "brake check[]" him during the pursuit. Appellant veered into the oncoming lane of traffic and drove toward a pedestrian standing near a parked vehicle, forcing the pedestrian to "run back across his vehicle to avoid being hit." As Appellant turned onto Seaman Street in Eastland, Trooper Astello observed Appellant stick his arm out of the vehicle and fire several shots into the air with a firearm while traveling at seventy-five miles per hour in a thirty-five mile per hour residential zone with "fairly heavy" traffic.[2] Appellant sped around the courthouse and disregarded stop signs. Trooper Astello testified that Appellant committed multiple traffic violations throughout the pursuit, including driving on the wrong side of the road, and speeding up to 100 miles per hour.

DPS Trooper Dale Carroll Escobedo testified that he and several other troopers were at the Eastland County Courthouse when they responded to the call about the pursuit on Highway 6 coming into Eastland. The troopers drove toward Highway 6, planning to intercept Appellant before he entered Eastland. Appellant passed the troopers and continued driving into downtown Eastland at seventy-to-eighty miles per hour. Troopers were unable to set up tire spikes to stop the vehicle because the downtown area had "so many streets and turns." Appellant continued speeding in downtown, forcing pedestrians and other drivers to "get[] out of the way." At some point during the pursuit, Appellant was driving toward Trooper Escobedo. Appellant crossed into Trooper Escobedo's lane, and Trooper Escobedo

---

[2]As detailed below, Appellant objected to the admission of evidence regarding him shooting a firearm from the vehicle's window. The trial court overruled Appellant's objection.

testified that he feared Appellant was going to cause a head-on collision. Trooper Escobedo pulled to the side of the road to avoid being hit head-on by Appellant. Trooper Escobedo believed that Appellant intentionally swerved into his lane of traffic.

DPS Trooper Robert Ronald McGrath was also involved in the pursuit. He testified that his goal was to "get ahead" of Appellant and to prevent him from continuing to evade the troopers. As the pursuit continued out of the downtown area, Trooper McGrath saw Appellant turn back onto Seaman Street. Trooper McGrath feared that Appellant was willing to hurt people as Appellant drove back toward the busy downtown area, rather than driving away from town and toward the country. Having seen Appellant swerve toward another police vehicle, Trooper McGrath decided to ram his patrol unit into the right front quarter panel of the plumbing vehicle in order to disable the vehicle and to prevent Appellant from reentering downtown. Appellant was pulled from the vehicle and subsequently treated at the hospital.

During the punishment phase, the owner of the plumbing vehicle testified that he sustained at least $25,000 in damages because the vehicle was a total loss and some equipment on the vehicle was never recovered. A nurse who treated Appellant after the crash testified that Appellant told her he shot the firearm at "a guy who was messing with [his] girl," and that he "intended on murdering him." Trooper Astello testified that Appellant's act of shooting the firearm from the vehicle's window constituted deadly conduct. Multiple troopers testified that Appellant was a "danger to society." Roger Lynn Brownlee, Eastland County's jail administrator, testified that Appellant did "not always" follow the rules while in jail awaiting trial. David Cherry, the director of adult probation in Eastland County, testified that Appellant

6

had previously been on probation. In Cherry's opinion, Appellant was not a suitable candidate for probation due to a lack of resources and "concern[]" for the community and probation officers.

Appellant testified during the punishment phase of trial that he had "so much regret" and apologized for his actions. Appellant confirmed that he used methamphetamine, amphetamine, and THC on the day of the offenses. Appellant testified that he was trying to take Miears's vehicle to find his girlfriend, who had been arrested at the church before Appellant fled. Appellant testified that his plan was to drive to the Eastland County jail and "turn himself in." When asked why he did not pull over if his plan was to turn himself into the jail, Appellant responded, "I'm not an intelligent person."

Appellant testified that he shot the firearm out of the vehicle's window "between seven and nine times." Appellant denied shooting the firearm "in town near houses." Appellant denied aiming for a pedestrian while driving, and testified that the vehicle had lost traction because it was raining. Appellant denied intending to hit Trooper Escobedo when he crossed into his lane. Appellant admitted that he was in possession of methamphetamine on the day of the incident.

Appellant testified that he had had a difficult childhood. Appellant said that he has had problems with alcohol and narcotics since he was a teenager and that he had been sexually molested by a member of his parent's church when he was fifteen. Appellant testified that he has tried to commit suicide "[s]everal times" throughout his life. Appellant also testified that he did not take the medication prescribed to him by mental health facilities. Appellant agreed with his trial counsel's statement that he "probably wouldn't be here today" if he had taken his medication as

7

prescribed. Appellant's parents testified and confirmed that Appellant had had a difficult childhood and that he had an issue with narcotics.

*Analysis*

*Batson Challenge*

In his first issue, Appellant contends that the trial court abused its discretion when it overruled his *Batson* challenge and did not find purposeful discrimination in the State's use of a peremptory strike against a Black juror. *See Batson v. Kentucky*, 476 U.S. 79 (1986); *see also* TEX. CODE. CRIM. PROC. ANN. art. 35.261 (West 2006). A challenge under *Batson* involves a three-step process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Hall v. State*, 663 S.W.3d 15, 40–41 (Tex. Crim. App. 2021) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008)). "In evaluating purposeful discrimination, a court inquires as to whether 'the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination.'" *Compton v. State*, 666 S.W.3d 685, 698 (Tex. Crim. App. 2023) (quoting *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019)). "[P]urposeful discrimination is shown when all the 'relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike[s] . . . [were] not motivated in substantial part by discriminatory intent.'" *Id.* (quoting *Flowers*, 588 U.S. at 288).

A trial court's determination of whether the defendant has shown purposeful discrimination "is a pure credibility finding," and the trial court's ruling on a *Batson* challenge will be affirmed unless it is clearly erroneous. *Hall*, 663 S.W.3d at 41

8

(citing *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) ("The term 'pretext' is solely a question of fact; there is no question of law.")). We consider the entire voir dire record on appeal, and we "are not limited to arguments or considerations that the parties called to the trial judge's attention, so long as the arguments or considerations are grounded in the appellate record." *Compton*, 666 S.W.3d at 698. In reviewing for clear error, we may consider the following factors: "(1) statistical evidence; (2) evidence of disparate questioning of similarly-situated venirepersons; (3) side-by-side comparisons of the stricken venirepersons and the accepted venirepersons; (4) whether the record supports the State's explanations for its strikes; and (5) any other relevant circumstance bearing on the issue of purposeful discrimination." *Id.*

Here, Appellant's trial counsel made a *Batson* challenge after the State used a peremptory strike on the only Black venireperson on the panel (Venireperson No. 2). The trial court found that the challenge was timely and asked for the State's response. The State's proffered race-neutral reason for striking Venireperson No. 2 was that he "specifically stated everyone deserves a second chance." The State elaborated that its strike was "based on comments [Venireperson No. 2] made in voir dire, specifically comments he made in response to questions presented to him by [Appellant's trial counsel.]" The conversation between Appellant's trial counsel and the venireperson that the trial court was referring to is as follows:

> [DEFENSE COUNSEL]: Now, I want to talk about punishment. This case, punishment is important to this case. I want to spend some time talking about punishment and how you feel about punishment, and how you think about it, and what it's for. [Venireperson No. 2], how do you feel about punishment?
>
> VENIREPERSON: How do I feel about it?

[DEFENSE COUNSEL]:  Yeah.

VENIREPERSON:  Oh, man.

[DEFENSE COUNSEL]:  Why do we punish people at the courthouse?

VENIREPERSON:  Because of something they did wrong.  Me, myself, I've done a lot of things wrong.  I haven't gotten caught, but me, myself, I feel like this is my own -- I feel like everybody should get a second chance in life because we all make mistakes in life.

[DEFENSE COUNSEL]:  We all make mistakes.  Everybody should get a second chance.  What do you feel like the purpose for punishment here in the courthouse is?  And it's okay if your answer is, everybody should get a second chance, according to --.

VENIREPERSON:  I mean, I'm a straight and blunt person.  I mean, I feel like if you do the crime, you do the time; but, at the same time, though, you know, it's so hard, the mercy on that person, you know.  I have had my faults, too.  Like I was telling you, I just never got caught.

[DEFENSE COUNSEL]:  Are you like me?  If they caught you for everything you did, they would have to put you under the jail.

VENIREPERSON:  Pretty much, yeah.

The trial court overruled the *Batson* challenge and empaneled the jury.

Appellant acknowledges that we are unable to glean statistical information on the entire venire panel and the venirepersons on whom the State exercised peremptory strikes because the record before us does not reflect the racial makeup of the entire venire panel.  Nevertheless, Appellant asserts that the State failed to show a race-neutral reason for striking Venireperson No. 2 because (1) the State never individually questioned Venireperson No. 2, and (2) several other venirepersons also stated that they believed in second chances or in giving grace, yet not all venirepersons who did so were struck by the State.  Appellant specifically

asserts that the State did not strike Venireperson Nos. 5 and 15, despite their indications that they believe in second chances or in grace.

As discussed below, the record shows that the State individually questioned Venireperson No. 2 and struck Venireperson No. 15. Further, the responses given by the State's stricken venirepersons indicated that they would consider giving a second chance or extending grace to determine *if* punishment is warranted. Accordingly, the record supports the State's nondiscriminatory reasons for exercising its peremptory strikes and the trial court did not clearly err in overruling Appellant's *Batson* challenge.

The record does not reflect disparate questioning of similarly-situated venirepersons. *See Compton*, 666 S.W.3d at 698. Appellant's contention that the State never individually questioned Venireperson No. 2 is incorrect. During the State's voir dire, Venireperson No. 2 raised his hand when the State asked if the venirepersons knew someone who had "been charged with possession of drug cases, and/or gone through rehab, or had some issues in their family." Veniresperson No. 2 raised his hand and told the State that his cousin had been involved with drugs and went to prison. When the State asked Venireperson No. 2 if he had a "preconceived idea about how people should be handled for drug cases," he responded, "No." Venireperson No. 2 told the State that his cousin's case had been handled fairly and that he would be able to consider the full range of punishment if someone were to be found guilty of possession of a controlled substance.

Venireperson No. 2 also said that his family member's case happened "in DFW," and the State asked if Venireperson No. 2 was "okay with" the fact that a prosecutor on Appellant's case was a former prosecutor in Tarrant County. Venireperson No. 2 responded "Yes, ma'am." The State then continued asking

similar questions to the other venirepersons who said that they knew someone that had been involved with drugs. Further, Appellant's trial counsel asked numerous venirepersons what they thought the purpose of punishment was after his conversation with Venireperson No. 2. Therefore, the record demonstrates that venirepersons who were similarly-situated to Venireperson No. 2 were asked similar questions from both the State and Appellant's trial counsel. *See Compton*, 666 S.W.3d at 698.

Despite Appellant's assertion to the contrary, the State struck Venireperson No. 15, who said of punishment:

> I think it is a teaching tool, like I use with my own kids, but I also know I can punish my son for the same thing multiple times, and he still doesn't understand. So, I think grace goes into it as well.

The State also struck Venireperson No. 29, who said:

> I am kind of like everybody else on punishment, depending on the severity of the decision that was made. I do feel there is an element of grace that can be given, you know, if it's found to not be clear, but I think it is necessary for the decision that was made, if it was severe enough.

Finally, the State struck Venireperson No. 30, who said that she "believe[d] in grace" and that:

> [P]unishment . . . can be a time of growth, but also can be detrimental in a lot of ways, and I think that each case needs to be weighed and thought about, specifically to that person and what led up to those events in order to determine how that punishment should or should not be applied.

The State did not strike Venireperson No. 35, who said that:

> [Y]ou could be punished for the crime, but it also needs to be on an individual basis. There is a difference between a first time offender and someone who has offended multiple times. Kind of like he said, you got have [sic] a lot of grace, but fit it to the individual, according to the

punishment. I think it can be a way to rehabilitate the individual, and I also think it can be a way to deter them from repeating, and give them a time of reflection as well.

The State did not strike Venireperson No. 17, who said that:

I believe it's a system of checks and balances, and that if somebody is found guilty on a trial, that, you know, whatever the punishment is, I believe that it's whether they deserve a second chance.

Finally, the State did not strike Venireperson No. 5, who said:

I mean, if the evidence is there, it's there. I mean, if the evidence is truly there, if you see stuff that happened, or you know, you can't just -- In my case, I see plenty of theft. It'[s] on camera. How do you lie about it? Do I believe people get second chances? Yes, but --.

Accordingly, while the State did not strike every venireperson who would consider second chances or grace in their punishment determination, the State struck more than half of those who did. Thus, there is support in the record for the State's explanation that it struck Venireperson No. 2 because he said that he believed in second chances—especially considering that Venireperson No. 2 said "everybody" deserved a second chance, while the venirepersons who were not struck indicated that punishment was particular to the facts and circumstances surrounding the underlying offense.

The State also said that it struck Venireperson No. 2 because of "comments he made in response to questions presented to him by [Appellant's trial counsel]." It is thus also plausible that the State struck Venireperson No. 2 based on his aforementioned conversation with Appellant's trial counsel regarding the difficulty of determining a person's punishment because he had also made "mistakes" in the past and had "never got[ten] caught."

The totality of the record supports the State's explanation that it struck Venireperson No. 2 because of his belief in second chances, and the record does not

support the assertion that the State's justification was "merely a pretext for racial discrimination." *See Compton*, 666 S.W.3d at 710. Therefore, we cannot say that the trial court clearly erred in accepting the State's proffered race-neutral reason for striking Venireperson No. 2. We overrule Appellant's first issue.

*Charge Error*

In his second issue, Appellant asserts that the trial court erred when it submitted a punishment charge with a prior version of Article 37.07, Section 4(a) with repealed "good conduct time" language. *See* CRIM. PROC. art. 37.07 § 4(a) (West Supp. 2023). The relevant portion of the trial court's charge stated as follows:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time the defendant may earn. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

The relevant portion of the correct parole instruction, which should have been included in the jury charge, provides as follows:

The length of time for which a defendant is imprisoned may be reduced by the award of parole.

Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, the defendant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less. If the defendant is sentenced to a term of less than four years, the defendant must serve at least two years before the defendant is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law might be applied to this defendant if sentenced to a term of imprisonment, because the application of that law will depend on decisions made by parole authorities.

You may consider the existence of the parole law. You are not to consider the manner in which the parole law may be applied to this particular defendant."

*Id.* Thus, the trial court's parole instruction was erroneous because it incorrectly informed the jury that Appellant would receive credit for good conduct time toward parole. However, Appellant did not object to this error in the trial court.

Under Article 36.14, the trial court is required to give the jury a written charge "setting forth the law applicable to the case." CRIM. PROC. art. 36.14 (West 2007); *Vega v. State*, 349 S.W.3d 514, 518 (Tex. Crim. App. 2013). A review of alleged jury-charge error involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim.

15

App. 1994). We must first determine whether the charge contained any actual error. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. If there was actual error, we must next determine whether the error resulted in sufficient harm to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. If an appellant fails to object to or present a properly requested jury charge, any error in the charge "should be reviewed only for 'egregious harm' under *Almanza*." *Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

The State concedes that the trial court's parole instruction was erroneous, but asserts that Appellant did not suffer egregious harm from it. Appellant urges us to "adopt" Judge Clinton's dissent in *Keady v. State* and find that the charge was egregiously harmful because it did not explain *why* jurors are not permitted to discuss parole during their deliberations. *See Keady v. State*, 687 S.W.2d 757, 761 (Tex. Crim. App. 1985) (Clinton, J., dissenting) ("[J]urors would be better informed and equipped to remove operation of parole laws from consideration during their deliberations if and when they are given a common sense reason for doing so."). We decline to conclude that Appellant was harmed when the trial court did not include additional language in its charge that was not requested and is not found in Article 37.07, Section 4(a). *See* Crim. Proc. arts. 36.14; 37.07 § 4(a); *Luquis v. State*, 72 S.W.3d 355, 363 (Tex. Crim. App. 2002) ("The Texas Legislature enacted legislation that *requires* the trial judge to instruct the jury in the precise wording that the statute recites . . . There are even quotation marks around the wording of the instruction. That is at least some indication that the Legislature did not want any creative deviations from its chosen language.").

Irrespective of Appellant's *Keady* argument, the trial court erred in giving a charge that contained language not found in Article 37.07, Section 4(a). Because Appellant did not object to the erroneous parole instruction, reversal is only required if the alleged error results in egregious harm. *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015). "Charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Arrington v. State*, 451 S.W.3d 834, 840 (Tex. Crim. App. 2015) (quoting *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)).

Egregious harm is only shown when the error "created such harm that [the appellant] 'has not had a fair and impartial trial.'" *Almanza*, 686 S.W.2d at 171. In *Almanza*, the Texas Court of Criminal Appeals outlined four factors that a reviewing court should consider when determining whether a jury charge error resulted in egregious harm: (1) the charge itself; (2) the state of the evidence, including contested issues and the weight of the probative evidence; (3) arguments of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *See Villarreal*, 453 S.W.3d at 433.

We first analyze the erroneous instruction in relation to the jury charge as a whole. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. Here, the jury was specifically instructed as follows:

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular

17

defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Therefore, while the jury should not have received any instructions about good conduct time, the mitigating language that was included in the punishment charge communicated to the jury that they could not consider the possibility of Appellant being awarded good conduct time in their sentencing. This "curative" instruction prevented harm to Appellant because it cautioned the jury that it could not consider good conduct time during its assessment of punishment. *Newman v. State*, 49 S.W.3d 577, 581 (Tex. App.—Beaumont 2001, pet. ref'd). In the absence of evidence to the contrary, we presume the jury followed the instructions that the trial court gave in its charge. *See Archie v. State*, 340 S.W.3d 734, 741 (Tex. Crim. App. 2011); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). Because nothing in the record shows that the jury considered the possibility that Appellant may be given good conduct time during its deliberations, this factor weighs against a finding of egregious harm.

Second, we examine the state of the evidence. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. Neither side presented evidence regarding Appellant's ability to earn good conduct time. Therefore, the second factor weighs against a finding of egregious harm.

Third, we consider the arguments of counsel. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. The State did not make an opening statement during punishment, and Appellant's trial counsel's opening statement focused on the mitigating evidence about Appellant's life, such as his difficult childhood. During its closing, the State characterized the punishment phase as "all about probation versus prison." Appellant's trial counsel asked the jury to focus on Appellant's

18

"facts in his life that brought him to this point and assess an individual sentence for [Appellant]." Neither side discussed good conduct time during closing arguments. Thus, the third factor weighs against a finding of harm.

Fourth, we consider any other relevant information in the record. *Villarreal*, 453 S.W.3d at 433; *Almanza*, 686 S.W.2d at 171. The jury did not send any notes to the trial court during punishment. Therefore, there was no indication in the record that the jury was impermissibly considering whether Appellant would receive good conduct time, and this factor weighs against a finding of egregious harm.

None of the *Almanza* factors demonstrate that Appellant's defensive theories were affected by the trial court's erroneous instruction, or that the error created such harm that Appellant was unable to have a fair trial. *See Alaniz v. State*, 648 S.W.3d 657, 662–64 (Tex. App.—Eastland 2022, no pet.). We overrule Appellant's second issue.

*Extraneous Offense*

In his third issue, Appellant contends that the trial court abused its discretion when it admitted evidence of the extraneous act of Appellant shooting a firearm from the window of the vehicle while he was evading arrest. The State responds that the trial court did not err in admitting the evidence because it constituted same-transaction contextual evidence.

Whether to admit evidence at trial is a preliminary question to be decided by the trial court. TEX. R. EVID. 104(a); *Tienda v. State*, 358 S.W.3d 633, 637–38 (Tex. Crim. App. 2012). We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). The trial court's decision will be upheld as long as it was within the "zone of reasonable disagreement." *Beham v. State*¸ 559 S.W.3d 474, 478 (Tex. Crim.

19

App. 2018). We will not reverse a trial court's evidentiary ruling, even if the trial court's reasoning is flawed, if it is correct on any theory of law that finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016).

Evidence of an extraneous offense is not admissible during the guilt/innocence phase to prove that a defendant acted in conformity with his character. TEX. R. EVID. 404(b); *Inthalangsy v. State*, 634 S.W.3d 749, 756 (Tex. Crim. App. 2021); *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). An extraneous offense may, however, be admissible for another purpose. *Ithalangsy*, 634 S.W.3d at 756; *Devoe*, 354 S.W.3d at 469. A trial court's decision to admit extraneous offense evidence will generally be within the zone of reasonable disagreement if the evidence of the extraneous offense is "relevant to a material, non-propensity issue." *See Devoe*, 354 S.W.3d at 469 (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)).

As noted by the Court of Criminal Appeals:

> Evidence of another crime, wrong, or act also may be admissible as same-transaction contextual evidence where "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, . . . of any one of them cannot be given without showing the others." *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Rogers v, State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993)). The jury is entitled to know all relevant surrounding facts and circumstances of the charged offense. *Id.* But, under Rule 404(b), same-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence, and it is admissible "only to the extent that is necessary to the jury's understanding of the offense." *Id.* (quoting *Pondexter v. State*, 942 S.W.2d 577, 584 (Tex. Crim. App. 1996)).

*Devoe*, 354 S.W.3d at 469; *see also Ithalangsy*, 634 S.W.3d at 756.

At the start of trial, Appellant's trial counsel notified the trial court that he would be requesting a hearing on the video footage of Appellant shooting a firearm from the window of the vehicle (the firearm video) before it was played for the jury. The State responded that the firearm video would be admissible as same-transaction contextual evidence and as evidence of the "steps taken by [Appellant] in preparation for the charged offense planned." During Trooper Astello's testimony, Appellant's trial counsel asked to approach before playing the firearm video. Appellant's trial counsel objected to the firearm video and asserted that Appellant's act of shooting the firearm was "an extraneous offense that is not relevant to this case." The trial court overruled Appellant's objection, and the firearm video was played for the jury. Trooper Astello testified that he saw Appellant's "arm come out the window, about a 45 degree, and then the handgun and I heard the shots being fired." Two other officers testified that they were aware Appellant shot a firearm during the pursuit.

On appeal, Appellant asserts that the evidence related to him shooting a firearm should not have been admitted at trial because the act does not qualify as same-transaction contextual evidence. Appellant cites *Burnett* and *Webb* in support of his proposition. *See Burnett v. State*, 488 S.W.3d 913 (Tex. App.—Eastland 2016), *aff'd*, 541 S.W.3d 77 (Tex. Crim. App. 2017); *Webb v. State*, No. 08-02-00142-CR, 2003 WL 22162337 (Tex. App.—El Paso 2003, no pet.) (not designated for publication).

In *Burnett*, the appellant was convicted of driving while intoxicated and unlawfully carrying a weapon. 488 S.W.3d at 916. The appellant rear-ended a vehicle, and the responding officer conducted a DWI investigation after the appellant showed signs of intoxication. *See id.* The arresting officer searched the appellant incident to his arrest, and found twenty-one pills in his jacket pocket. *See id.*

Another officer arrived and found more pills and a pill bottle in the appellant's vehicle. *See id.* The officers determined that the pills looked like hydrocodone. *See id.* at 917.

The State offered evidence of the pills as same-transaction contextual evidence. *See id.* The appellant asserted that evidence of the pills would be more prejudicial than probative where the State had no evidence showing that the pills were in the appellant's system at the time of the offense. *See id.* The trial court ruled that the evidence was admissible as same-transaction contextual evidence. *See id.* On appellate review, we concluded that:

> [E]ven if Appellant's possession of the pills was unlawful and constituted a separate offense, this is not a case in which the evidence related to the pills is necessary to the jury's understanding of the instant offense. *This was not a crime spree in which multiple offenses occurred in a short amount of time* or in which one offense occurred to further another offense, such as committing theft in order to purchase and possess more drugs. This was a simple case in which the jury was required to determine whether Appellant was driving while intoxicated. We cannot say that evidence of the pills was so intertwined with the charged offense that it was necessary to explain the context of the DWI. Under the facts of this case, evidence related to the pills could only be necessary to the jury's understanding of the instant offense if there was evidence that Appellant's intoxication was caused from ingesting the pills. As we have discussed, there is no such evidence. Therefore, the trial court abused its discretion when it admitted the pills and evidence related to the pills as same[-]transaction contextual evidence.

*See id.* at 920 (emphasis added).

Appellant analogizes the facts of this case to our conclusion in *Burnett*, asserting that he "was charged with five separate and distinct crimes." He asserts that, simply because they "occurred one following the other, . . . does not mean that

22

every act throughout the day constituted same-transactional contextual evidence admissible willy-nilly as the trial progressed."

Appellant also distinguishes the facts of his case from the Eighth Court of Appeals' opinion in *Webb*. 2003 WL 22162337, at *1. In *Webb*, officers attempted to arrest a man after finding drug paraphernalia and contraband in his motel room. *Id.* The man ran, got into the stolen vehicle the appellant was driving. The appellant drove away, instigating a high-speed chase. *Id.*

At trial, the appellant in *Webb* sought to exclude evidence that the man he had driven away with had drug paraphernalia and contraband in his motel room. The Eighth Court of Appeals held that the evidence was same-transaction contextual evidence because it "help[ed] explain why [the man] fled from the police and in turn, what may have motivated Appellant to assist [the man] and thereby commit the charged offense of evading arrest." *Id.* at *2. The court further held that the evidence made it more probable that the appellant was intentionally fleeing from a police officer that he knew was trying to detain him, and that the appellant's decision to aid the man is what ultimately led to his arrest. *Id.*

According to Appellant, the challenged evidence in *Webb* was only considered part of the same transaction because it was evidence of flight. In contrast, Appellant asserts, the act of shooting a firearm did not show why Appellant was fleeing from police, nor did it "show any other rational relationship to any of the charged offenses."

We construe Appellant's case comparisons to be assertions that: (1) Appellant committed several complete and distinct offenses in a short period of time; and (2) Appellant's act of shooting a firearm while simultaneously committing the offense of evading arrest in a vehicle provided no additional context as to

Appellant's reason for evading arrest or committing any other offense, rendering it irrelevant. However, Appellant incorrectly views his offense of evading arrest in isolation. While Appellant uses *Burnett* to assert that a separate offense committed simultaneously as the charged offense is not necessarily same-transaction contextual evidence, we specifically distinguished the facts in *Burnett* from a "crime spree." *See Burnett*, 488 S.W.3d at 920. We noted in *Burnett* that there was no connection between the pills found on the appellant's person and the underlying offense of driving while intoxicated. *See id.*

Here, a "crime spree" is a more apt description of the numerous offenses comprising Appellant's entire criminal episode, given that he "did not rest between incidents." *See Devoe*, 354 S.W.3d at 469–70. Appellant shooting a firearm from the vehicle window is embedded within Appellant's crime spree, and was "part of [a] continuing episode" of connected offenses—beginning with Appellant committing aggravated robbery against Miears and stealing a vehicle, and continuing when Appellant committed deadly conduct, aggravated assault against a public servant, and evading arrest or detention with a vehicle. Therefore, unlike the possession of pills in *Burnett*, the extraneous offense was a relevant piece of a "continuing course of conduct." *See id.* at 470; *Burnett*, 488 S.W.3d at 920.

Further, Appellant's act of shooting a firearm occurred during the commission of evading arrest or detention with a vehicle, and while he was fleeing the scene of the aggravated robbery. "[F]light is admissible as a circumstance from which an inference of guilt may be drawn." *Devoe*, 354 S.W.3d at 470 (quoting *Alba v. State*, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995). "And if 'the extraneous offense is shown to be a necessarily related circumstance of the defendant's flight, it may be admitted to the jury.'" *Id.* Appellant's evading arrest was not only an offense in and

24

of itself, but also a circumstance from which Appellant's guilt of aggravated robbery may be drawn. *See id.* And while Appellant was using a stolen vehicle to evade arrest for the aggravated robbery, he shot a firearm from the window of the stolen vehicle. Therefore, Appellant shooting a firearm was "inextricably intertwined" with the evading and aggravated robbery offenses. *See Worthy v. State*, 312 S.W.3d 34, 39 (Tex. Crim. App. 2010).

Finally, the evidence of Appellant shooting a firearm was relevant to the other offenses he committed because it gave context to his "crime spree" in which he repeatedly endangered the lives of citizens and officers. Accordingly, it was within the zone of reasonable disagreement to find that Appellant's act of shooting a firearm was same-transaction contextual evidence and the trial court did not abuse its discretion in admitting the evidence. Because the trial court did not abuse its discretion, there was no error, and we need not conduct a harm analysis. *See* TEX. R. APP. P. 47.1. We overrule Appellant's third issue.

Appellant's fourth issue is also related to the evidence of Appellant's act of shooting the firearm from the vehicle. He asserts that the trial court was required to sua sponte give a limiting instruction under Article 37.07, Section 3(a)(1) of the Code of Criminal Procedure, and that by not doing so, it allowed evidence of an extraneous act during punishment. *See* CRIM. PROC. art. 37.07 § 3(a)(1). Appellant is incorrect in making this assertion. The Court of Criminal Appeals explicitly held in *Devoe* that "a limiting instruction is not required when evidence is admitted as same-transaction contextual evidence." *See Devoe*, 354 S.W.3d at 471 (citing *Castaldo v. State*, 78 S.W.3d 345, 352 (Tex. Crim. App. 2002); *Wesbrook v. State*, 29 S.W.3d 103, 114–15 (Tex. Crim. App. 2000)). Because we have concluded that the trial court did not err in admitting the extraneous offense of shooting a firearm

as same-transaction contextual evidence, "no instructions were required." *See id.* We overrule Appellant's fourth issue.

*This Court's Ruling*

We affirm the judgments of the trial court.


JOHN M. BAILEY

CHIEF JUSTICE


September 26, 2024

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.